23 A.3d 912

RICHARD LUCHEJKO, PLAINTIFF–APPELLANT, v. THE CITY OF HOBOKEN, CM3 MANAGEMENT COMPANY AND SKYLINE CONDOMINIUM ASSOCIATION, DEFENDANTS–RESPONDENTS, AND D & D SNOW PLOWING COMPANY, DEFENDANT.

Argued March 15, 2011—Decided July 27, 2011.

194 

*Denise Campbell* argued the cause for appellant (*Campbell Legal Associates,* attorneys).

*Robert C. Neff, Jr.,* argued the cause for respondents Skyline Condominium and CM3 Management Company (*Wilson, Elser, Moskowitz, Edelman & Dicker,* attorneys; *Mr. Neff* and *Mathew J. Broderick,* on the brief).

*Christopher K. Harriott* submitted a letter in lieu of brief on behalf of respondent The City of Hoboken (*Florio & Kenny,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

In this appeal we review whether a 104–unit condominium complex is liable in tort for injury sustained by a pedestrian on its abutting public sidewalk. An unbroken series of decisions by this Court has maintained a distinction between commercial and residential property owners for the purpose of imposing a duty to maintain sidewalks. In *Stewart v. 104 Wallace Street, Inc.,* 87 *N.J.* 146, 432 *A.*2d 881 (1981), based on a balancing of relevant tort law considerations, we held that it would be fair for commercial landowners to be held responsible for maintaining abutting public sidewalks and to be required to recompense innocent pedestrians injured as a result of the negligent failure to do so. We did not then extend sidewalk liability to residential properties, *id.* at 159 n. 6, 432 *A.*2d 881, and have not done so since. *See, e.g., Dupree v. City of Clifton,* 175 *N.J.* 449, 815 *A.*2d 960 (2003) (maintaining commercial/residential distinction).

In this matter, the Appellate Division affirmed the trial court's grant of summary judgment to the property owner, concluding that no reasonable trier of fact could find that this overwhelmingly owner-occupied 104–unit condominium complex was a commercial entity. *Luchejko v. City of Hoboken,* 414 *N.J.Super.* 302, 315, 998 *A.*2d 506 (App.Div.2010). We granted certification, 205 *N.J.* 98, 13 *A.*3d 361 (2010), and now affirm. There is no call to upset the well-established and longstanding difference in the duties imposed on residential versus commercial property owners. Moreover, we agree with the courts that have considered this matter and have concluded that this condominium complex is residential.

## I.

### A.

At approximately 6:40 a.m. on Tuesday, February 14, 2006, plaintiff Richard Luchejko was walking to work in Hoboken, New Jersey. It had snowed between eighteen and twenty-seven inches on Sunday, February 12, but had not snowed since. That morning, the sidewalks in Hoboken were generally clear of snow, but some patches of ice remained. While walking on the sidewalk abutting 551 Observer Highway, Luchejko slipped on a sheet of black ice and fell. As a result, he broke his left leg below the knee. According to him, the sidewalk had not been salted. The police officer who responded to the scene of the accident confirmed, in his report, that the area was icy.

### B.

551 Observer Highway is the site of a 104–unit condominium complex (the Building). Each of the 104 units is owned in fee simple by individual residents who have an undivided interest in the common elements. Any person who owns a condominium in the Building is a member of the Skyline at Hoboken Condominium Association, Inc. (Skyline),[1] and only an owner may be a member of Skyline. Pursuant to the Condominium Act, *N.J.S.A.* 46:8B–1 to –38, Skyline is "responsible for the administration and management of the condominium and condominium property, including

---

[1] Although Skyline does not own the common elements of the Building, it is the proper party to defend this action because (1) the unit owners have no individual liability for injuries that occur on the common elements, *N.J.S.A.* 46:8B–16(c); (2) Skyline is responsible for the common elements, *N.J.S.A.* 46:8B–14(a); and (3) Skyline has exclusive standing to maintain actions to protect the rights and interests of the unit owners in the common elements. *See Siller v. Hartz Mountain Assocs.*, 93 *N.J.* 370, 380–81, 461 A.2d 568, *cert. denied*, 464 *U.S.* 961, 104 *S.Ct.* 395, 78 *L.Ed.*2d 337 (1983). *See generally Jennings v. Borough of Highlands*, 418 *N.J.Super.* 405, 421–22 (App.Div.2011) (noting that a condominium association "does not, generally, own legal title to the common elements").

but not limited to the conduct of all activities of common interest to the unit owners." *N.J.S.A.* 46:8B–12.

Non-owners are not permitted in the Building without permission from an owner or Skyline. The Master Deed for the property specifically states, "No Unit ... shall be used for any purpose other than as a private residence." Owners are permitted to lease their units, but may not do so for any period shorter than thirty days (i.e., they cannot rent their units "for transient or hotel purposes"). Although no competent proofs were tendered on the point, Skyline's counsel estimated that approximately ten percent of the units are rented out. There is no retail space in the Building and Skyline does not generate a profit.

Skyline is operated by a five-person Board of Trustees (Board) whose duties, according to its bylaws, include, among other things, collecting assessments from the members to pay expenses, preparing budgets and financial statements, making employment decisions, paying taxes levied upon the Building, obtaining appropriate insurance, and maintaining the "common elements" of the property. According to the Master Deed, those "common elements" include, but are not limited to, "[a]ll curbs, sidewalks, stoops, hallways, stairwells, porches and patios." [2]

The Master Deed requires the owners to pay an "Annual Common Expense" assessment, which

---

[2] The Condominium Act requires Skyline to maintain

insurance against liability for personal injury and death for accidents occurring within the common elements whether limited or general and the defense of any actions brought by reason of injury or death to person, or damage to property occurring within such common elements and not arising by reason of any act or negligence of any individual unit owner.

[*N.J.S.A.* 46:8B–14(e).]

The Condominium Act defines "[c]ommon elements" to include, among other things, "the land described in the master deed;" "yards, gardens, walkways, parking areas and driveways, excluding any specifically reserved or limited to a particular unit or group of units;" and "such other elements and facilities as are designated in the master deed as common elements." *N.J.S.A.* 46:8B–3(d)(i), (iii), (viii).

shall be used exclusively for promoting the health, safety, pleasure and welfare of the members of the Association including, but without limitation; ... maintenance, repair and replacement of the Common Elements or any other improvements on the Property; payment of insurance premiums; all costs and expenses incidental to the operation and administration of the Association; and, such other items as may from time to time be deemed appropriate by the Board of Trustees.

The Master Deed also requires Skyline to carry "amounts of blanket property insurance" as required by Skyline's bylaws. The bylaws, in turn, require Skyline to "maintain public liability insurance insuring the Association and its members against any claims arising from injuries or damages occurring on the common elements and facilities."

## C.

CM3 Management Company (CM3) was hired by Skyline to serve as the property manager for the Building. CM3 collected assessments from the owners, kept Skyline's books and budgets, hired personnel, paid Skyline's bills, and attended Board meetings. Skyline paid CM3 a flat, monthly fee for work performed.

On October 1, 2005, CM3 hired D & D Snow Plowing Company (D & D) to provide snow-clearing services for the property through April 2006. Pursuant to the contract, D & D agreed to service "the main parking lots, main entrances to the lots, and the lot's front sidewalk.... Also all sidewalks surrounding the building and the building main entrance will be shoveled and cleared. Ice melt shall be provided to the areas plowed and/or shoveled." D & D was to clear the property whenever more than two inches of snow accumulated and to inspect the premises to determine if salt was necessary when it anticipated icy conditions, such as a refreeze. CM3 was not required to call D & D to initiate snow removal and CM3 did not actively supervise D & D's work, although occasionally it did inspect the sidewalks, through the doorkeeper, after D & D's servicing.

D & D serviced Skyline five times on February 12, 2006, clearing snow and spreading ice melter each time. According to D & D, the sidewalks were clear after the last service. D & D

visited the property again on February 13, to ensure that it was still clear. D & D did not re-inspect the premises again prior to Luchejko's accident on February 14.

In addition to the services provided by D & D, the doorkeepers hired by Skyline would occasionally spread salt on the sidewalks. They generally inspected the sidewalks at the beginning and end of their shifts. The first doorkeeper on duty on the morning of February 14 (there was no doorkeeper overnight) arrived at 7:00 a.m., shortly after Luchejko's fall.

## D.

The Code of the City of Hoboken (Hoboken City Code) is the applicable municipal law. Pursuant to authority granted by *N.J.S.A.* 40:65–12, the Hoboken City Code mandates that private persons remove snow and ice from sidewalks abutting their property:

> The owner or occupant or person having charge of any dwelling house, store or other building or lot of ground in the city shall, within the first six (6) hours after every fall of snow or hail, or after the formation of any ice upon the sidewalks, unless the ice is covered with sand or ashes, cause the snow and ice to be removed from the sidewalk abutting such dwelling house, store, building or lot of land and piled not more than eighteen (18) inches from the curbline into the public street or roadway.
>
> [*City of Hoboken, N.J.*, Code § 168-8(A) (2010).]

Hoboken hires inspectors to check the main streets approximately six hours after any snowfall to ensure compliance with that ordinance; however, no inspection was performed on the day of Luchejko's accident. Hoboken has no record of a complaint being filed or a citation being issued for failure to clear the snow from Skyline's abutting sidewalks on February 14.

## E.

Luchejko sued Skyline, CM3, Hoboken, and D & D. His complaint generally alleged negligence for an unsafe sidewalk and (as against Hoboken) violations of the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 59:12–3.

All defendants moved for summary judgment. The trial court granted summary judgment to Skyline, CM3, and Hoboken, but not to D & D. Luchejko then settled his claim with D & D and moved for reconsideration of the grant of summary judgment to the remaining defendants. That motion was denied.

Luchejko appealed and the Appellate Division affirmed. *Luchejko, supra,* 414 *N.J.Super.* at 321, 998 *A.*2d 506. The panel concluded that Hoboken was not responsible for the sidewalk, *id.* at 315–20, 998 *A.*2d 506, and, without differentiating between Skyline and CM3,[3] declared that "there is no basis from which a reasonable trier of fact could find that Skyline was a commercial entity," subject to liability under *Stewart.* *Id.* at 315, 998 *A.*2d 506. We granted Luchejko's petition for certification regarding Skyline and CM3 only. *Luchejko, supra,* 205 *N.J.* 98, 13 *A.*3d 361.[4]

## II.

### A.

Certain basic principles serve as the backdrop to this appeal.

■ First, it has long been the law in this state that breach of an ordinance directing private persons to care for public property

> shall be remediable only at the instance of the municipal government ... and that there *shall be no right of action to an individual citizen* especially injured in consequence of such breach. The most conspicuous cases of this sort are those that deny liability to private suit for violation of the *duty imposed by ordinance upon abutting property-owners to maintain sidewalk pavements or to remove ice and snow from the walks.*
>
> [*Fielders v. N. Jersey St. Ry. Co.,* 68 *N.J.L.* 343, 352 (E. & A. 1902) (emphases added).]

The rationale is that such ordinances are not adopted for the intended purpose of protecting individual members of the public,

---

[3] Separate arguments were not advanced by Skyline and CM3, who were represented by the same lawyer.

[4] Luchejko did not file a petition in connection with the Appellate Division's affirmance of the grant of summary judgment to Hoboken.

but rather are to impose upon those regulated "the public burdens of the municipal government." *Id.* at 355. That rule has remained unaltered for more than one hundred years. *See Brown v. Saint Venantius Sch.,* 111 *N.J.* 325, 335, 544 *A.*2d 842 (1988) ("[W]e acknowledge the well-settled principal that municipal ordinances do not create a tort duty, as a matter of law."); *Lodato v. Evesham Twp.,* 388 *N.J.Super.* 501, 507, 909 *A.*2d 745 (App.Div. 2006) (same).

Second, at common law, property owners had no duty to clear the snow and ice from public sidewalks abutting their land. *See Davis v. Pecorino,* 69 *N.J.* 1, 4, 350 *A.*2d 51 (1975). If a property owner decided to remove snow from a public sidewalk, he would not be liable to a person who injured himself on the sidewalk "unless through [the owner's] negligence a new element of danger or hazard, other than one caused by natural forces, [was] added to the safe use of the sidewalk by a pedestrian." *Saco v. Hall,* 1 *N.J.* 377, 381, 63 *A.*2d 887 (1949). As such, if a sidewalk had been cleared and the melting snow subsequently froze into a layer of ice, the "refreeze" would not be an "element of danger or hazard other than one caused by natural forces." *Foley v. Ulrich,* 94 *N.J.Super.* 410, 424, 228 *A.*2d 702 (App.Div.) (Kolovksy, J.A.D., dissenting), *rev'd,* 50 *N.J.* 426, 236 *A.*2d 137 (1967) (reversing and adopting the Appellate Division dissent). That rule, which survives today for residential property owners, reflects the societal interest in encouraging people to clear public sidewalks and the inequity of imposing liability on those who voluntarily do so.

Third, it is of no moment in this matter that Skyline is a corporation rather than a natural person. *See Brown, supra,* 111 *N.J.* at 333, 544 *A.*2d 842 ("[W]e consider the use of the abutting land, not the nature of the organization that owns the property.").

With those principles in mind, we turn to the existing law on sidewalk liability.

### B.

Prior to 1981, our law adhered to the common law rule elaborated above that, absent active misconduct, property owners

would not be liable for dangerous sidewalk conditions. *See, e.g.,*
*Yanhko v. Fane,* 70 *N.J.* 528, 534–37, 362 *A.*2d 1 (1976) (finding no
liability where commercial owner allowed sidewalk to fall into
disrepair). In *Stewart, supra,* which involved a plaintiff injured
from a fall on a dilapidated sidewalk abutting a commercial
establishment, this Court expressly overruled *Yanhko,* and held
that "[c]ommercial property owners are henceforth liable for
injuries on the sidewalks abutting their property that are caused
by their negligent failure to maintain the sidewalks in a reason-
ably good condition." 87 *N.J.* at 149–50, 432 *A.*2d 881.

The decision in *Stewart* identified multiple reasons that sup-
ported imposition of the new rule for commercial entities. First,
commercial entities have considerable rights over adjacent side-
walks, including setting up "stoops, areas, shutes, and other
domestic and trade conveniences," *id.* at 151, 432 *A.*2d 881 (quota-
tion marks and citation omitted), and imposing a duty associated
with those rights was "not 'arbitrary,' as suggested in *Yanhko," id.*
at 158, 432 *A.*2d 881. In that regard, we noted that "sidewalks
provide commercial owners with easy access to their premises and
increase the value of their property." *Id.* at 152, 432 *A.*2d 881.
We also observed that because many municipalities require private
citizens to care for public sidewalks, the original reasoning behind
the former rule (that it was the government's duty to tend to
public sidewalks) no longer was compelling. *Id.* at 155–56, 432
*A.*2d 881. In concluding that it was appropriate to have the law
evolve, justification for the change in liability for commercial
property owners was rooted in the fact that the former rule
"undermine[d] basic goals of tort law" in two ways: it left many
innocent victims without recourse, and it gave no incentive to
landowners to care for their sidewalks and prevent injuries. *Id.* at
155, 432 *A.*2d 881. And, in recognition of the commercial nature
of the defendant, we found it arbitrary to allow a plaintiff-invitee
to recover for injuries sustained within a business establishment,
but to deny her recovery if the injury happened on the negligently
maintained sidewalk only a few feet outside the business's door.
*Id.* at 156–57, 432 *A.*2d 881. It was of considerable consequence

that the new rule was being adopted only for commercial property owners, for our decision highlighted that the imposition of additional insurance premiums and maintenance expenses "will be treated as one of the necessary costs of doing business," regardless of the size of the business. *Id.* at 160, 432 *A.*2d 881.

After justifying the imposition of liability, we carefully limited the expanse of the holding:

> *The duty to maintain abutting sidewalks that we impose today is confined to owners of commercial property.* While we acknowledge that whether the ownership of the property abutting the sidewalk is commercial or residential matters little to the injured pedestrian, we believe that the case for imposing a duty to maintain sidewalks is particularly compelling with respect to abutting commercial property owners.
>
> . . . .
>
> *As for the determination of which properties will be covered by the rule we adopt today, commonly accepted definitions of "commercial" and "residential" property should apply,* with difficult cases to be decided as they arise.
>
> [*Id.* at 159–60, 432 *A.*2d 881 (internal citations omitted) (emphases added).]

Specifically reserved was "whether the same duty should be imposed on owners of residential property." *Id.* at 159 n. 6, 432 *A.*2d 881. That said, the Court singled out apartment buildings as an example of property that should be treated as commercial under the new rule. *Id.* at 160 n. 7, 432 *A.*2d 881.

In our first related decision post-*Stewart,* we held that the *Stewart* rule carries with it a duty to remove ice and snow if failure to do so would be negligent under the circumstances. *Mirza v. Filmore Corp.,* 92 *N.J.* 390, 395–96, 456 *A.*2d 518 (1983). The *Mirza* Court again noted that *Stewart's* "goal of spreading the risk of loss would probably be served either through the increase of future insurance policy premiums, or . . . through higher charges for the commercial enterprise's goods or services." *Id.* at 397, 456 *A.*2d 518.

Thereafter, in *Brown, supra,* this Court had occasion to address one of the difficult commercial versus residential fact scenarios foreshadowed in *Stewart.* 111 *N.J.* at 327, 544 *A.*2d 842. *Brown* involved a plaintiff who slipped on ice in front of a nonprofit, private, religious school. *Ibid.* Our analysis in that matter began

from the starting point that *Stewart's* duty holding applied only to "commercial" rather than "residential" property owners, and we therefore sought to determine into which camp the school fell. *Ibid.*

Recognizing that the school "is not a residential property [because n]o one resides in the [s]chool," *id.* at 332, 544 *A.*2d 842, we explained that the religious nature of the school was not dispositive: "we consider the *use* of the abutting land, not the *nature* of the organization that owns the property," *id.* at 332–33, 544 *A.*2d 842 (emphasis added). In assessing whether the school was more akin to commercial property than to residential property, we reasoned that the nonprofit status of the defendant should not act as a shield to liability because many nonprofit companies "have substantial assets and healthy balance sheets, while many for-profit enterprises operate on thin profit margins." *Id.* at 334, 544 *A.*2d 842; *see also id.* at 332, 544 *A.*2d 842 (noting defendant school charged tuition, employed teachers, purchased supplies, and maintained physical plant). Ultimately, we determined that to treat the school as commercial for sidewalk liability purposes would be appropriate because requiring the school to clear its sidewalks was not an overly onerous imposition, and an allocation of the risk of loss was more equitably placed on the school than on an innocent passerby. *Id.* at 334–35, 544 *A.*2d 842. Thus, we held that the parochial school would be treated as a "commercial landowner[ ]" for sidewalk liability purposes. *Id.* at 338, 544 *A.*2d 842.

In cases since, we may have grappled with what was or was not commercial property, but we have not deviated in our holdings or in our discussions of the law from the basic principle that residential property owners are not liable for sidewalk injuries. We adhered to that no-duty rule for residential property in *Nash v. Lerner*, 157 *N.J.* 535, 724 *A.*2d 798 (1999). There, this Court reversed a decision of the Appellate Division on the basis of the dissent below. *Ibid.* The facts as set forth in the Appellate Division's decision revealed that the plaintiff sued a property

owner after she tripped on a sidewalk, traversing a driveway, in front of a purely private residence. *Nash v. Lerner,* 311 *N.J.Super.* 183, 187, 709 *A.*2d 799 (App.Div.1998). The Appellate Division dissent, which the Court adopted, had argued that the defendant's act of driving over the abutting sidewalk to access the driveway was not a "direct use" that could render her—a residential property owner—liable to the plaintiff for the sidewalk's deterioration. *Id.* at 193–94, 709 *A.*2d 799 (Rodríguez, J.A.D., dissenting). Because the property's use unquestionably was residential, rather than commercial, and because defendant's mere use of the sidewalk to access her driveway and home did not constitute active misconduct, the property owner was immune from liability. *Ibid.*

Most recently, in *Dupree, supra,* we affirmed a decision of the Appellate Division, again based on the opinion below, where a woman had tripped and injured herself on a sidewalk made uneven by tree roots. 175 *N.J.* at 449, 815 *A.*2d 960; *Dupree v. City of Clifton,* 351 *N.J.Super.* 237, 239, 798 *A.*2d 105 (App.Div.2002). The abutting landowner was a nonprofit church that used its property solely for religious and noncommercial purposes. *Id.* at 240, 798 *A.*2d 105. The opinion by the Appellate Division, adopted by this Court, reaffirmed that the central inquiry is whether the property is commercial or residential, noting that such a determination normally "address[es] the nature of the ownership of the property." *Id.* at 242, 798 *A.*2d 105. In the case of *nonprofit* owners, however, the Appellate Division properly recognized that the examination must focus on "the nature of the *use* of the property and not the nature of the ownership." *Id.* at 242–43, 798 *A.*2d 105. As the panel explained, "[i]f the organization's use of the property is partially or completely 'commercial,' *e.g.,* if the property is used as a parish *and* for commercial purposes or solely used for commercial purposes, liability attaches despite the nonprofit status of the owners." *Id.* at 245–46, 798 *A.*2d 105. With those principles clearly understood, the panel properly concluded that because the property in issue was used solely for religious purposes it was not "commercial" under *Stewart.* *Ibid.*

In light of this Court's comment in *Stewart, supra,* that apartment buildings should be treated as commercial property, 87 *N.J.* at 160 n. 7, 432 *A.2d* 881, in several cases the Appellate Division has parsed closely whether "residential" property has been decamped to commercial demarcation through various uses made of the premises.[5] To the extent that a theme emerges from those decisions, it is that central to the Appellate Division's inquiry in such matters has been whether a property's predominant use has the capacity to generate income, regardless of whether an actual profit is obtained through the use. That said, we need not address the universe of appellate decisions, with their fine distinctions. Our decisions consistently reflect that residential property owners stand on different footing than commercial owners who have the ability to spread the cost of the risk through the current activities of the owner. And, this matter provides no reason in law or in fact to corrode that distinction. In our view, the opinion of the Appellate Division, authored by Judge Rodríguez, properly

[5] *See, e.g., Wilson v. Jacobs,* 334 *N.J.Super.* 640, 642–43, 646–47, 760 *A.2d* 818 (App.Div.2000) (holding that non-owner-occupied house entirely rented to tenant was "commercial" notwithstanding that tenant was family member whose rent consisted of cost of mortgage, taxes, and performing small repairs); *Briglia v. Mondrian Mortg. Corp.,* 304 *N.J.Super.* 77, 79, 698 *A.2d* 28 (App.Div.) (holding that residential home was not commercial merely because mortgagee had foreclosed and held it at time of accident), *certif. denied,* 152 *N.J.* 13, 702 *A.2d* 352 (1997); *Wasserman v. W.R. Grace & Co.,* 281 *N.J.Super.* 34, 37, 39, 656 *A.2d* 453 (App.Div.1995) (determining that residential owner who used one room as telecommuting office was not "commercial" owner); *Avallone v. Mortimer,* 252 *N.J.Super.* 434, 438, 599 *A.2d* 1304 (App.Div.1991) (stating that where residential property is partially owner-occupied and partially rented, the "applicable considerations of balance and ability to pass along cost require that the residential sidewalk exception be continued for owner-occupants whose residency is established to be the predominant use"); *Borges v. Hamed,* 247 *N.J.Super.* 295, 296, 589 *A.2d* 169 (App.Div.1991) (holding that multi-family home partially occupied by owner and partially rented to relatives was not "commercial"); *Hambright v. Yglesias,* 200 *N.J.Super.* 392, 394–95, 491 *A.2d* 768 (App.Div.1985) (holding that two-family house entirely rented out by owner for profit was "commercial"); *cf. Abraham v. Gupta,* 281 *N.J.Super.* 81, 85, 656 *A.2d* 850 (App.Div.) (determining that vacant lot unrelated to business enterprise was not "commercial," explaining that "[i]t is the capacity to generate income which is the key"), *certif. denied,* 142 *N.J.* 455, 663 *A.2d* 1362 (1995).

analyzed the facts of this case and concluded, as do we, that the use is residential and, therefore, no sidewalk liability attaches for the injury to the plaintiff pedestrian. *Luchejko, supra,* 414 *N.J.Super.* at 313–15, 998 *A.*2d 506.

### III.

### A.

As the Appellate Division noted about these facts,

[h]ere, Skyline is a non-profit corporation and its members are the present unit owners within the Skyline complex. Only owners are permitted to be members. The owners are permitted to lease their individual units, subject to the covenants and restrictions contained in the deed and by-laws. Although fees are collected from the members, the funds collected are used solely for the upkeep of the property, with no profit realized. This is different from a rental apartment building, which is considered commercial due to the owner's capacity to generate income from the property. Further, those persons who hold trustee positions within Skyline do not earn an income for their participation and thus there is no benefit derived.

[*Luchejko, supra,* 414 *N.J.Super.* at 313–14, 998 *A.*2d 506 (internal citations omitted).]

The record reveals further that that Master Deed restricts the use of each unit only as a private residence. No retail space exists in the Building. As the Appellate Division decision reflects,

Skyline does, however, have the capacity to spread the risk of loss arising from injuries on abutting sidewalks but not in the way in which the courts have suggested "through higher charges for the commercial enterprise's goods and services." Skyline does not provide the public with goods and services and therefore can not increase charges to accommodate such liability.

[*Id.* at 314, 998 *A.*2d 506 (internal citations omitted).]

Although Skyline is required by its bylaws to maintain liability insurance, public sidewalks are not required to be covered under the Master Deed and are not a common element under the policy. *Ibid.* Even if they were, the spreading of the cost of insurance among residential owners is not the sharing of risk originally presented in the commercial setting of *Stewart,* where the cost of the insurance could be shifted to patrons and other business endeavors of the entity as a cost of doing business. *See Mirza, supra,* 92 *N.J.* at 397, 456 *A.*2d 518 (observing that liability is

funded through "higher charges for the commercial enterprise's goods or services"); *Stewart, supra*, 87 *N.J.* at 159–60, 432 *A.*2d 881 (stating that sidewalk liability is part of "cost[ ] of doing business," and that sidewalks are "beneficially related to the operation of the business" (quoting *Krug v. Wanner*, 28 *N.J.* 174, 180, 145 *A.*2d 612 (1958))). Moreover, the possibility that liability insurance in sufficient amounts might be purchased by residents of a condominium organization does not eliminate the potential that a large enough liability verdict could pose the risk of a person losing what is likely his or her largest asset: one's home.

## B.

The commercial/residential dichotomy represents a fundamental choice not to impose sidewalk liability on homeowners that was established nearly three decades ago. Stare decisis thus casts a long shadow over these proceedings. We should not lightly break with a line of decisions that has promoted settled expectations on the part of residential property owners.

The doctrine of stare decisis—the principle that a court is bound to adhere to settled precedent—serves a number of important ends. The doctrine "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 *U.S.* 808, 827, 111 *S.Ct.* 2597, 2609, 115 *L.Ed.*2d 720, 737 (1991).

Stare decisis "carries such persuasive force that we have always required a departure from precedent to be supported by some special justification." *State v. Brown*, 190 *N.J.* 144, 157, 919 *A.*2d 107 (2007) (quoting *Dickerson v. United States*, 530 *U.S.* 428, 443, 120 *S.Ct.* 2326, 2336, 147 *L.Ed.*2d 405, 419 (2000)); *see also Flomerfelt v. Cardiello*, 202 *N.J.* 432, 458, 997 *A.*2d 991 (2010) (LaVecchia, J., concurring) (concurring with majority, despite disagreement with rationale of controlling case, because stare

decisis compelled adherence to precedent). Special justification to overturn precedent might exist when the passage of time illuminates that a ruling was poorly reasoned, *see, e.g., White v. Twp. of N. Bergen,* 77 *N.J.* 538, 550–54, 391 *A.*2d 911 (1978) (adopting "Vanderbilt thesis" from dissent of *Fox v. Snow,* 6 *N.J.* 12, 76 *A.*2d 877 (1950), that reevaluation of precedent is necessary "as conditions change and as past errors become apparent"), when changed circumstances have eliminated the original rationale for a rule, *see, e.g., Immer v. Risko,* 56 *N.J.* 482, 487–88, 495, 267 *A.*2d 481 (1970) (abrogating interspousal immunity on basis that its rationale no longer existed), when a rule creates unworkable distinctions, *see, e.g., J & M Land Co. v. First Union Nat'l Bank ex rel. Shepard,* 166 *N.J.* 493, 521, 766 *A.*2d 1110 (2001) (explaining that "courts are not constrained to follow precedent" when "governing decisions are unworkable" (quotation marks and citation omitted)), or when a standard defies consistent application by lower courts, *see, e.g., Payne, supra,* 501 *U.S.* at 829, 111 *S.Ct.* at 2611, 115 *L.Ed.*2d at 738 (overturning holdings that "defied consistent application").

None of those special justifications are present here. The rationale of *Stewart* and *Mirza* remains sound and there are no changed circumstances such that reevaluation is necessary. Although the sidewalk liability line of cases has contained spirited concurrences and dissents arguing for broader liability, those separate opinions registered simple disagreements with the majorities' point of view and did not foretell difficulties that have come to pass in administering the commercial/residential distinction. *See Stewart, supra,* 87 *N.J.* at 160–62, 432 *A.*2d 881 (Schreiber, J., concurring) (listing policy reasons why all landowners should be liable for negligent maintenance of sidewalks, but not criticizing residential/commercial distinction as unworkable or otherwise problematic); *see also Brown, supra,* 111 *N.J.* at 341–44, 544 *A.*2d 842 (Pollock, J., concurring) (arguing for adoption of Justice Schreiber's *Stewart* concurrence).

Moreover, although a handful of difficult cases have probed the

gray area of the commercial/residential distinction,[6] the framework continues to provide guidance and predictability for the overwhelming majority of property owners. Residential homeowners can safely rely on the fact that they will not be liable unless they create or exacerbate a dangerous sidewalk condition; commercial owners, defined in reference to their use of the property and its capacity to generate income, know that clearing their abutting sidewalks is a cost of doing business and that failure to do so can lead to liability.

Importantly, petitioner's proposed rule (and, essentially, the position advanced by the dissent)—that a court should in each sidewalk injury case balance the equities to determine whether a tort duty exists[7]—would eliminate the clarity of the residential/commercial dichotomy, and replace it with an unpredictable case-by-case balancing test that would be extremely difficult to fairly and consistently administer and that would lead to tremendous uncertainty. At oral argument we challenged the parties to articulate a reworked bright-line rule that might principally sweep in condominium complexes such as Skyline while still insulating ordinary homeowners from liability. No such rule was forthcoming. Thus, there is even greater reason today to stand by our settled jurisprudence and not lightly cast it aside.

---

[6] *See, e.g., Restivo v. Church of Saint Joseph of the Palisades,* 306 *N.J.Super.* 456, 458–59, 469, 703 A.2d 997 (App.Div.1997) (holding that church-landlord that leased to nonprofit and poor residents could be liable because sole use of property was commercial, despite low rents charged), *certif. denied,* 153 *N.J.* 403, 709 A.2d 796 (1998); *Avallone, supra,* 252 *N.J.Super.* at 438, 599 A.2d 1304 (stating that where residential property is partially owner-occupied and partially rented: "[the] applicable considerations of balance and ability to pass along cost require that the residential sidewalk exception be continued for owner-occupants whose residency is established to be the predominant use.").

[7] The petition for certification asks this Court to "abandon the antiquated, restrictive and often misleading use of the terms 'commercial' versus 'residential' in favor of a balancing of the equities analysis." Alternatively, the petition suggests that all landowners should have a duty to maintain the sidewalks abutting their property.

## C.

 Notwithstanding the development of more modern forms of home ownership, many of the facts emphasized by plaintiff about Skyline are more incidents of the size of Skyline rather than its true nature. But the law teaches that size should be disregarded when applying the residential/commercial distinction. *See Stewart, supra,* 87 *N.J.* at 160, 432 *A.*2d 881.

In our view the development of the condominium form of home ownership has done nothing to undermine the principles that support the residential/commercial dichotomy that was recognized when *Stewart* overruled *Yanhko* and established sidewalk liability only for commercial property owners. In so doing, we said that "commonly accepted definitions of 'commercial' and 'residential' property should apply." *Stewart, supra,* 87 *N.J.* at 160, 432 *A.*2d 881. In applying the commonly understood notion of residential property in today's times, we hold that Skyline is residential and therefore is not subject to sidewalk liability.

## IV.

 Finally, to the extent that CM3 is a distinct defendant, not specifically addressed by the Appellate Division, and one that plaintiff urges should be found separately liable, we reject that final argument. Although ordinarily a question of agency involves fact questions for the jury, *see Miller v. Linde,* 33 *N.J.Super.* 41, 43, 109 *A.*2d 290 (App.Div.1954), here plaintiff does not dispute the facts surrounding CM3's relationship with Skyline; he disputes the legal conclusions to be drawn from those facts. Therefore, CM3's status is a question of law subject to de novo review by this Court. *See ibid.*

 Based on the record, and for the following reasons, CM3 was Skyline's agent, not its independent contractor. Skyline paid CM3 a flat, monthly fee rather than per job performed. In servicing Skyline, CM3 paid the association's bills, collected money from the owners when Skyline decided to levy assessments, and

entered into contracts on behalf of Skyline when Skyline needed specific services. With respect to the contract with D & D, Skyline initially requested that CM3 find a snow-removal vendor, and ultimately consented to the relationship when CM3 presented D & D. Those facts are indicative of the sort of retained control that makes a relationship a true agency. *See Baldasarre v. Butler,* 132 *N.J.* 278, 291, 625 *A.*2d 458 (1993) (stating that retained control is key). Because CM3 was Skyline's agent, it owes no duty to plaintiff since Skyline owed no such duty. *See Printing Mart–Morristown v. Sharp Elecs. Corp.,* 116 *N.J.* 739, 762, 563 *A.*2d 31 (1989). In situations where "the principal owes no duty or less than the normal duty of care to the person harmed," the agent likewise has either no duty or a diminished duty to that third party even "for actions that otherwise would constitute a tort." *Ibid.* (quoting *Restatement (Second) of Agency* § 343 (1958)).

## V.

The judgment of the Appellate Division is affirmed.

Justice LONG, dissenting.

Today the Court leaves without recourse an innocent pedestrian, injured on the icy sidewalk of a 104 unit condominium complex, which assessed its members for snow and ice removal and for the procurement of liability insurance on its common elements, including its sidewalks.

In reaching that conclusion, with which I disagree, the Court interprets our decision in *Stewart v. 104 Wallace St., Inc.,* 87 *N.J.* 146, 432 *A.*2d 881 (1981), as establishing a mere sorting exercise in which our role is to declare into which predetermined category—commercial or residential—the landowner falls, without a conscientious analysis of whether it is fair to impose a duty under the circumstances presented.

To be sure, after conducting a traditional duty analysis in *Stewart,* we ruled that a purely commercial entity should be exposed to sidewalk liability. *Id.* at 157–60, 432 *A.*2d 881. But

that is all we ruled. In *Stewart*, we did not reach the issue of the sidewalk liability of residential or hybrid forms of property ownership and use. *See id.* at 159 n. 6, 432 *A*.2d 881. More to the point, we specifically recognized that there would be "difficult" determinations in the future. *Id.* at 160, 432 *A*.2d 881. By way of example, we noted that an apartment complex, wholly residential in use, would be subject to sidewalk liability. *Id.* at 160 n. 7, 432 *A*.2d 881.

Our case law has followed that paradigm in the three decades since *Stewart*, clearly eschewing a bright-line analysis in favor of equitably balancing the duty factors. As a result, some residential owners have been held liable for accidents on their sidewalks and some non-residential owners have been spared such liability. *See Restivo v. Church of St. Joseph of Palisades*, 306 *N.J.Super.* 456, 468, 703 *A*.2d 997 (App.Div.1997), *certif. denied*, 153 *N.J.* 403, 709 *A*.2d 796 (1998). The point is that the so-called commercial-residential distinction is nothing more than a label for the duty analysis, not a substitute.

When that analysis, which is moored in public policy and fairness, is undertaken, it leads ineluctably to the conclusion that the condominium association in this case should be liable because: it should have foreseen the fall; it was in the best position to have taken prophylactic measures to prevent it; and it was better able to bear the risk of loss than the innocent pedestrian, who should not go uncompensated. For those reasons, I respectfully dissent.

## I.

Historically, property owners in New Jersey were not liable for dangerous sidewalk conditions caused by natural forces or ordinary wear and tear, unless such dangerous conditions were exacerbated by their own misconduct. *See Yanhko v. Fane*, 70 *N.J.* 528, 532, 362 *A*.2d 1 (1976). Absent such active misconduct, the private landowner of a sidewalk could not be held responsible for failure to maintain it. *Ibid.* That approach was rooted in the established common-law rule that "the primary responsibility for

providing and maintaining streets and sidewalks resides in the government." *Id.* at 537, 362 *A.*2d 1.

### A.

That principle of non-liability changed in 1981 when we decided *Stewart,* which involved a plaintiff who fell on a dilapidated sidewalk next to a tavern. *Stewart, supra,* 87 *N.J.* at 149–50, 432 *A.*2d 881. In *Stewart,* we overruled *Yanhko* and recognized a duty of care on the part of "commercial" property owners, who we declared are "henceforth liable for injuries on the sidewalks abutting their property that are caused by their negligent failure to maintain the sidewalks in reasonably good condition." *Id.* at 150, 432 *A.*2d 881.

Our point of departure in *Stewart,* which is equally applicable today, was that "[s]idewalks are an essential feature of our urban landscapes ... intended primarily for pedestrians." *Id.* at 151, 432 *A.*2d 881 (quoting *Davis v. Pecorino,* 69 *N.J.* 1, 5, 350 *A.*2d 51 (1975)) (internal quotation marks omitted). Indeed, "the primary function of the sidewalk [is] the public's right of travel on it." *Ibid.* (quoting *Davis, supra,* 69 *N.J.* at 5, 350 *A.*2d 51) (internal quotation marks omitted). And, although abutting owners have "considerable interest in and rights to use the sidewalk," especially owners of abutting commercial property, "the right of the public to safe and unimpeded passage along the sidewalk must prevail." *Id.* at 151–52, 432 *A.*2d 881.

To that end, in *Stewart,* we approached the issue from the perspective of adopting a rule that would vindicate the public's right to safe travel over sidewalks and, at the same time, be fair to abutting landowners. In so doing, we gave short shrift to the idea of governmental responsibility for sidewalks, because it had been superseded,[1] *id.* at 155–56, 432 *A.*2d 881, and also observed that

---

[1] *N.J.S.A.* 40:65–14, effective December 14, 1970, expressly authorizes a municipality to impose the duty on "any owner of abutting lands ... to construct, repair, alter or relay any curb or sidewalk, or section thereof."

abutting landowners already bore numerous responsibilities for their sidewalks. *Id.* at 152–53, 432 *A.2d* 881 (cataloguing landowner duties). We then employed a traditional tort law analysis to determine whether it would be fair to impose a duty on abutting landowners to maintain their sidewalks.

Commentators point out that a duty analysis is unique: " 'duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Prosser and Keeton on the Law of Torts,* § 53 at 358 (W. Page Keeton et al. eds., 5th ed. 1984); *see also* 1 Dan B. Dobbs, *The Law of Torts,* § 229 at 582 (2001) ("[D]uty should be constructed by courts from building blocks of policy and justice."). As we noted in *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 625 *A.2d* 1110 (1993):

> Determining the scope of tort liability has traditionally been the responsibility of the courts. *Kelly v. Gwinnell,* 96 *N.J.* 538, 552 [476 *A.2d* 1219] (1984). The actual imposition of a duty of care and the formulation of standards defining such a duty derive from considerations of public policy and fairness. *Ibid.* "This Court has carefully refrained from treating questions of duty in a conclusory fashion, recognizing that '[w]hether a duty exists is ultimately a question of fairness.' " *Weinberg v. Dinger,* 106 *N.J.* 469, 485, 524 *A.2d* 366 (1987) (quoting *Goldberg v. Housing Auth. [of Newark* ], 38 *N.J.* 578, 583 [186 *A.2d* 291] (1962)).
>
> Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. *Goldberg, supra,* 38 *N.J.* at 583 [186 *A.2d* 291]. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. *Ibid.* The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.
>
> [*Id.* at 439, 625 *A.2d* 1110.]

In *Stewart,* we analyzed the following four duty factors: (1) the foreseeability of sidewalk accidents; (2) the allocation of the risk of loss to the party best able to control that risk; (3) the distribution of the risk of loss to the party best able to bear it; and (4) the compensation of innocent victims. *See Stewart, supra,* 87 *N.J.* at 154–60, 432 *A.2d* 881; *see also Brown v. St. Venantius Sch.,* 111 *N.J.* 325, 342, 544 *A.2d* 842 (1988) (Pollock, J., concur-

ring); *Stewart, supra,* 87 *N.J.* at 161, 432 *A.*2d 881 (Schreiber, J., concurring); *Abraham v. Gupta,* 281 *N.J.Super.* 81, 84–86, 656 *A.*2d 850 (App.Div.) (characterizing *Stewart* as engaging in balancing policy considerations), *certif. denied,* 142 *N.J.* 455, 663 *A.*2d 1362 (1995); *Avallone v. Mortimer,* 252 *N.J.Super.* 434, 437–38, 599 *A.*2d 1304 (App.Div.1991) (same).

First, in terms of the nature of the risk, we recognized the inherent foreseeability of sidewalk accidents when sidewalks are not properly maintained. *See Stewart, supra,* 87 *N.J.* at 154, 432 *A.*2d 881 (describing injuries from deteriorated sidewalks as "all too foreseeable") (quoting *Murray v. Michalak,* 58 *N.J.* 220, 223, 276 *A.*2d 857 (1971) (Proctor, J., dissenting)).

Second, we were unequivocal that: "[l]ogic and common sense ... support the imposition of this duty, inasmuch as owners of abutting property are in an ideal position to inspect sidewalks and to take prompt action to cure defects." *Id.* at 158, 432 *A.*2d 881; *see also id.* at 161, 432 *A.*2d 881 (Schreiber, J., concurring) ("The property owner is generally in the best position to become aware of disrepair, and then correct the condition."). Further, we noted that a rule of non-liability would undermine the basic goals of tort law in "two critical ways"—by leaving innocent victims without recourse and by providing a disincentive to the owner to "repair deteriorated sidewalks and thereby prevent injuries." *Id.* at 155, 432 *A.*2d 881.

Third, we found that the imposition of sidewalk liability on commercial landowners was "particularly compelling" for two reasons: (1) the benefits that commercial landowners enjoy from safe sidewalks, such as the foot traffic of their patrons; and (2) the ability of commercial landowners to spread the costs of liability as "one of the necessary costs of doing business." *See id.* at 159–60, 432 *A.*2d 881.

Finally, we observed that the duty we recognized in *Stewart* would "provide a remedy to many innocent plaintiffs for injuries caused by improper maintenance of sidewalks." *Id.* at 157, 432 *A.*2d 881.

Although much of what we said in *Stewart* is equally applicable to all property owners, we specifically reserved on the question of extending liability to private residences because that was not the issue before us. *Id.* at 159 n. 6, 432 *A*.2d 881. Rather, we declared that to determine which properties were covered under the new rule, "commonly accepted definitions of 'commercial' and 'residential' should apply," but recognized that the issue was not inflexibly cut and dried and that there would be difficult cases in the future. *Id.* at 160, 432 *A*.2d 881. By way of example, we noted that despite their entirely residential use, "apartment buildings would be 'commercial' properties covered by the rule." *Id.* at 160 n. 7, 432 *A*.2d 881.

Subsequent to *Stewart,* we addressed the issue of sidewalk liability several times. In *Mirza v. Filmore Corp.,* 92 *N.J.* 390, 456 *A*.2d 518 (1983), we held that the *Stewart* rule carries with it a duty to remove snow and ice from the sidewalk if the failure to do so would be negligent under the circumstances. *Id.* at 395–96, 456 *A*.2d 518. In ruling in *Mirza,* we stated that:

No functional basis exists to differentiate an accumulation of snow or ice from other hazards. No persuasive reason has been advanced to apply a different standard of conduct when a dangerous situation arises because of impediments upon the sidewalk occasioned by natural events or the acts of man.

In many respects, the duty to remove snow and ice is more important and less onerous than the general duty of maintenance imposed in *Stewart.* Snow and ice pose a much more common hazard than dilapidated sidewalks. The many innocent plaintiffs that suffer injury because of unreasonable accumulations should not be left without recourse. Ordinary snow removal is less expensive and more easily accomplished than extensive sidewalk repair. Certainly commercial landowners should be encouraged to eliminate or reduce the dangers which may be so readily abated. Moreover, many municipalities have adopted ordinances that require snow removal.

[*Id.* at 395, 456 *A*.2d 518 (citation omitted).]

We also echoed *Stewart,* concluding that

the goal of spreading the risk of loss would probably be served either through the increase of future insurance policy premiums, *or, if the commercial property owner has no insurance,* through higher charges for the commercial enterprise's goods or services.

[*Id.* at 397, 456 *A*.2d 518 (emphasis added).]

Next, in *Brown*, we faced the matter of a plaintiff who slipped on ice on the sidewalk abutting a private school operated by a non-profit religious organization. *Brown, supra*, 111 *N.J.* at 327, 544 *A.*2d 842. There we were called upon to apply the *Stewart* analysis to the school. *Ibid.* The school clearly was "not a residential property" because "[n]o one reside[d] in the [s]chool." *Id.* at 332, 544 *A.*2d 842. Further, we viewed its non-profit status and its religious nature as essentially irrelevant to the liability issue. *Id.* at 333–34, 544 *A.*2d 842. We concluded, based on the *Stewart* duty factors, that it was fair to order the school to clear its sidewalks (as would be the case with a for-profit school) and that the risk of loss was more equitably placed on the school than on the injured pedestrian. *Id.* at 332–35, 544 *A.*2d 842.

In imposing liability in *Brown*, we concluded that, although the school was not technically "commercial," it satisfied the dual considerations that warranted imposing liability on "commercial" landowners in *Stewart*. *See id.* at 334–35, 544 *A.*2d 842. First, like businesses that derive benefits from safe sidewalks, "[s]afe and convenient access to the [s]chool is undeniably a necessary component of that defendant's daily activities." *Ibid.* Second, like businesses, the risk of loss was already spread by the school because "[p]rivate schools obviously carry liability insurance," *id.* at 335, 544 *A.*2d 842, and "charge[ ] tuition to [their] students," *id.* at 332, 544 *A.*2d 842. We therefore concluded that the school, which was neither a business nor a residence, was a "commercial" landowner within the meaning of *Stewart* and subject to sidewalk liability. *Id.* at 338, 544 *A.*2d 842.

Over a decade later, in *Nash v. Lerner*, 157 *N.J.* 535, 724 *A.*2d 798 (1999), we reversed a decision of the Appellate Division involving a plaintiff who tripped on a sidewalk in front of a private residence and sued the owner. *Nash v. Lerner*, 311 *N.J.Super.* 183, 185–86, 192–93, 709 *A.*2d 799 (App.Div.1998). We agreed with the dissent that the property was, in fact, residential and that the defendant's act of driving over the abutting sidewalk to get to her driveway was not the kind of active misconduct that could render

her liable to the plaintiff for the deteriorated condition of the sidewalk. *Id.* at 193–95, 709 *A.*2d 799 (Rodriguez, J., dissenting).

Most recently, we decided *Dupree v. City of Clifton,* 175 *N.J.* 449, 815 *A.*2d 960 (2003), which involved a plaintiff who tripped and injured herself on a sidewalk abutting a church. *Dupree v. City of Clifton,* 351 *N.J.Super.* 237, 239, 798 *A.*2d 105 (App.Div. 2002). The church used its property solely for religious and charitable purposes. *Id.* at 240, 798 *A.*2d 105. We affirmed the Appellate Division, which had declared, based on *Brown,* that, "[i]f the organization's use of the property is *partially* or completely 'commercial,' *e.g.,* if the property is used as a parish *and* for commercial purposes or solely used for commercial purposes, liability attaches despite the nonprofit status of the owners." *Id.* at 245–46, 798 *A.*2d 105 (emphasis added). Because the property in *Dupree,* unlike the private school in *Brown,* had no commercial element, was used solely for religious purposes, and had no way to distribute the risk of loss, we affirmed the Appellate Division's conclusion that it was not "commercial" under *Stewart. Id.* at 246–47, 798 *A.*2d 105.

## B.

The Appellate Division and trial courts have grappled with the commercial-residential distinction established in *Stewart* with varying results.[2] However, the one thing that is constant

---

[2] *See ante* at 206 n. 5, 23 *A.*3d at 921; *see also Restivo, supra,* 306 *N.J.Super.* at 467–69, 703 *A.*2d 997 (holding use of church property for below market rental units and pre-school "commercial"); *Smith v. Young,* 300 *N.J.Super.* 82, 97–98, 692 *A.*2d 76 (App.Div.1997) (declaring house owned by two different parties, one side owner-occupied and the other rented, "distinctly residential"); *Abraham, supra,* 281 *N.J.Super.* at 85–86, 656 *A.*2d 850 (holding lot zoned for commercial use but not generating income or engaged in business requiring safe access not "commercial"); *Christmas v. City of Newark,* 216 *N.J.Super.* 393, 402, 523 *A.*2d 1094 (App.Div.) (extending liability to church property leased to doughnut shop), *certif. denied,* 108 *N.J.* 193, 528 *A.*2d 19 (1987); *Lombardi v. First United Methodist Church,* 200 *N.J.Super.* 646, 647–48, 491 *A.*2d 1350 (App.Div.) (holding property exclusively used for church purposes not "commercial"), *certif. denied,*

throughout the decisions is the recognition that in *Stewart* we did not establish a bright-line rule; rather we engaged in a balancing of the relevant tort law considerations with an eye toward determining whether the imposition of a duty on landowners was rational and fair. *See, e.g., Abraham, supra,* 281 *N.J.Super.* at 84–86, 656 *A.*2d 850 (characterizing *Stewart* as engaging in balancing policy considerations); *Avallone, supra,* 252 *N.J.Super.* at 437–38, 599 *A.*2d 1304 (same). That is the correct view.

Indeed, our break from universal non-liability in *Stewart* was not based upon superficial labeling, but on the equitable balancing that is inherent in any duty analysis under tort law. It is for that reason that some premises which serve only as residences have found their way into the so-called "commercial" category, *see, e.g., Wilson v. Jacobs,* 334 *N.J.Super.* 640, 642–43, 646–47, 760 *A.*2d 818 (App.Div.2000); *Hambright v. Yglesias,* 200 *N.J.Super.* 392, 394–95, 491 *A.*2d 768 (App.Div.1985), and some clearly nonresidential premises have been spared from liability, *see, e.g., Abraham, supra,* 281 *N.J.Super.* at 85–86, 656 *A.*2d 850; *Lombardi, supra,* 200 *N.J.Super.* at 647–48, 491 *A.*2d 1350. *See Restivo, supra,* 306 *N.J.Super.* at 468, 703 *A.*2d 997 ("There are non-residential uses that are not commercial in character as that term is commonly understood and commercial properties that are seen not to embody qualities generally associated with business holdings." (citations omitted)). In short, as our case law makes clear, the commercial-residential distinction is only a shorthand statement of the weighing and balancing duty analysis required by *Stewart.*

## II.

With that history as prologue, I turn to the facts of this case. Skyline is a 104–unit, high-rise complex in the highly urbanized

101 *N.J.* 315, 501 *A.*2d 970 (1985); *Gilhooly v. Zeta Psi Fraternity,* 243 *N.J.Super.* 201, 206–08, 578 *A.*2d 1264 (Law Div.1990) (holding fraternity house which served as residence and social club "commercial").

city of Hoboken, in which pedestrian traffic abounds.[3] It is required by the Condominium Act, *N.J.S.A.* 46:8B–1 to –38, to have liability insurance to cover its common elements, *N.J.S.A.* 46:8B–14(e), which, according to the Master Deed, include all "sidewalks," *see N.J.S.A.* 46:8B–3(d)(viii). Skyline is required by the Hoboken City Code to remove snow and ice from its abutting sidewalks, and it has hired a service to do so. The cost of both its insurance and its snow and ice removal service, like all of the building's operating expenses, is paid for collectively by the assessments levied by Skyline on the owners of the 104 condominium units. Luchejko, through no apparent fault of his own, fell on Skyline's icy sidewalk and broke his leg. Under these circumstances, the *Stewart* analysis indicates that it is fair to impose a duty on Skyline to make its sidewalks safe for pedestrians.

First, it is plainly foreseeable to Skyline that failing to maintain its sidewalk will result in an increase in injuries to pedestrians. *See Stewart, supra,* 87 *N.J.* at 154, 432 *A.*2d 881 (describing injuries from deteriorated sidewalks as "all too foreseeable" (quoting *Murray, supra,* 58 *N.J.* at 223, 276 *A.*2d 857 (Proctor, J., dissenting))). Sidewalks exist for the benefit of the public to serve the paramount need of "unimpeded passage." *Id.* at 152, 432 *A.*2d 881. In densely-populated city areas, like Hoboken, sidewalk traffic is intense and when sidewalks are not cleared, pedestrians must proceed or risk stepping into moving traffic. Whether the sidewalk becomes a danger from disrepair or an accumulation of snow or ice, the potential that it will result in an injury is indisputably greater than a sidewalk kept in pristine condition. Further, in many ways injuries are more foreseeable on Skyline's sidewalks than on others—instead of 104 different lots, all 104 landowners have concentrated their use of the sidewalk on one

---

[3] According to the 2006 census estimate, Hoboken contains 39,853 people, residing in one square mile. *See* U.S. Census Bureau, *State & County Quick-Facts–New Jersey,* http://quickfacts.census.gov/qfd/states/34/3432250.html (last visited May 23, 2011).

small area, with a concomitant increase in the foot traffic of individuals coming and going to visit and service the 104 owners.

Second, as between Skyline and Luchejko, Skyline is the party best able to control the risks created by its sidewalks. Skyline is most intimately familiar with its sidewalks, and it is Skyline, above all others, which has the ability to make them safe or warn of their condition. *See id.* at 158, 432 *A.*2d 881; *see also id.* at 161, 432 *A.*2d 881 (Schreiber, J., concurring) ("The property owner is generally in the best position to become aware of disrepair, and then correct the condition."). It makes little sense to discourage action by the only party with the ability to act. *See id.* at 155, 432 *A.*2d 881; *see also Murray, supra,* 58 *N.J.* at 223, 276 *A.*2d 857 (Proctor, J., dissenting).

Third, as between Skyline and Luchejko, Skyline is the party best able to bear the risk of loss. Pursuant to its bylaws, Skyline "maintain[s] public liability insurance insuring the Association and its members against any claims arising from injuries or damages occurring on the common elements." *See Brown, supra,* 111 *N.J.* at 335, 544 *A.*2d 842 (imposing liability because defendant landowner "obviously carr[ies] liability insurance"). Not only does Skyline carry such insurance, it is required to carry it pursuant to the Condominium Act. *N.J.S.A.* 46:8B–14(e) (requiring condominium associations to maintain insurance covering injuries on common elements). According to the Master Deed, Skyline's common elements include "[a]ll curbs, *sidewalks,* stoops, hallways, stairwells, porches, and patios." [4] (Emphasis added). In short, Skyline is already required to carry insurance to cover injuries suffered on its sidewalks.[5]

---

[4] Arguably, had Skyline not defined the sidewalk as a common element in its Master Deed, it would still be a common element under the Condominium Act. *See N.J.S.A.* 46:8B–3(d)(ii), (iii), (viii) (defining "[c]ommon elements" to include, among other things, "entrances, exits and other means of access," "walkways," and "such other elements and facilities as are designated in the master deed as common elements").

[5] Although the majority suggests that the "sidewalks" referred to as common elements in the Master Deed are not the subject of the liability insurance, *see*

Moreover, whether or not Skyline is legally obligated to insure its sidewalks, it nevertheless is in a position to spread the risk of loss to its 104 owners through regular assessments. That cost-spreading mechanism was critical in *Stewart* and *Mirza* and has been recognized by the Appellate Division as crucial in the sidewalk liability analysis. *See, e.g., Abraham, supra,* 281 *N.J.Super.* at 85, 656 *A.*2d 850.

The cost-spreading rationale has been broadly interpreted—and, contrary to the majority's view, is not limited merely to businesses passing costs by charging higher prices; rather it is focused on the landowner's ability to bear the risk of loss better than the injured pedestrian. *See, e.g., Restivo, supra,* 306 *N.J.Super.* at 468–69, 703 *A.*2d 997 (imposing liability even though a "close[ ] call" because landowner could increase funding applications to cover additional maintenance costs and was obligated by contract to maintain liability insurance). Although Skyline has no customers, it does have a cost-spreading mechanism. The 104 condominium owners pay assessments to the association to cover "common expenses," including insurance. Plainly, Skyline is in a better position than Luchejko to bear the risks posed by its sidewalk.

Fourth, a rule of non-liability in this case would leave Luchejko, an apparently innocent injured party, without recourse—even though Hoboken requires Skyline to remove snow and ice and the 104 condominium owners pay for snow and ice removal and liability insurance for the property. *See Stewart, supra,* 87 *N.J.* at 155, 432 *A.*2d 881.

In sum, the majority's holding that this case should pivot off a bright-line application of the commercial-residential distinction misreads *Stewart* and its progeny and untethers the commercial-residential distinction from its logical moorings. Such a ruling

---

*ante* at 207, 23 *A.*3d at 922, that argument only suggests an ambiguity that would necessarily be resolved in favor of coverage. *See Sparks v. St. Paul Ins. Co.,* 100 *N.J.* 325, 336, 495 *A.*2d 406 (1985).

would only "mak[e] authority prevail unsupported by reason." Marcus Tullius Cicero, *De Natura Deorum* bk. I, § V at 13 (T.E. Page ed., H. Rackham trans., Harvard Univ. Press 1961) (c. 45 B.C.E.). The labels "commercial" and "residential" are by-products of—not substitutes for—the analysis required by *Stewart*. Here, the *Stewart* analysis compels the conclusion that Skyline owes a duty to innocent pedestrians to keep its abutting sidewalks safe. To read *Stewart* otherwise is to ignore its analysis in favor of the labels it applied to the result it achieved.[6]

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, RIVERA–SOTO, and HOENS—4.

*For reversal*—Justice LONG and ALBIN—2.

---

[6] It goes without saying that *stare decisis* is not at issue here. *Stewart* applied our traditional duty analysis to reach its conclusions. That has been fully understood by our courts since *Stewart* up until today. *See Abraham, supra,* 281 *N.J.Super.* at 84–86, 656 *A.2d* 850; *Avallone, supra,* 252 *N.J.Super.* at 437–38, 599 *A.2d* 1304. There is nothing groundbreaking about applying the *Stewart* duty analysis here.