SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Alejandra Padilla v. Young Il An (A-43-22) (087862)**

**Argued November 8, 2023 -- Decided June 13, 2024**

**PIERRE-LOUIS, J., writing for the Court.**

In this appeal, the Court considers whether owners of vacant commercial lots have a common law duty to maintain the public sidewalks abutting those lots in reasonably good condition.

In September 2019, plaintiff Alejandra Padilla allegedly tripped, fell, and suffered injuries on the sidewalk abutting a vacant commercial lot in Camden. At the time of plaintiff's fall, defendants Young Il An and Myo Soon An owned the subject lot, which they had purchased in 1992, intending to construct a building there. According to testimony, they never built a structure on that lot or on the adjacent lot they also owned because "the economic situations [were] really bad," and they did not purchase liability insurance to cover the lot because insurance companies "didn't really want to insure it."

In April 2020, plaintiff filed a complaint alleging that defendants' negligence in failing to reasonably maintain the sidewalk abutting the subject lot caused her fall and resulting injuries. Defendants moved for summary judgment. The trial court granted defendants' motion, holding they did not owe a duty of care to plaintiff. The court relied heavily on Abraham v. Gupta, 281 N.J. Super. 81 (App. Div. 1995), which held that the liability imposed on commercial property owners to reasonably maintain abutting sidewalks does not apply to sidewalks abutting vacant lots. The court reasoned that defendants did not have a duty to maintain the sidewalk because it abutted a vacant lot that was not generating any income, citing Stewart v. 104 Wallace Street, Inc., 87 N.J. 146 (1981). The trial court rejected plaintiff's contention that summary judgment was improper because a Camden municipal ordinance required defendants to maintain the lot's abutting sidewalk, explaining that municipal ordinances do not create a separate common law duty. The Appellate Division affirmed. The Court granted certification. 253 N.J. 570 (2023).

**HELD:** Considerations of fairness lead the Court to hold that all commercial landowners -- including owners of vacant commercial lots -- have a duty to maintain the public sidewalks abutting their property in reasonably good condition and are

1

liable to pedestrians injured as a result of their negligent failure to do so. Consistent with the rule it adopts today, the Court reverses the Appellate Division's judgment and remands the matter to the trial court for further proceedings.

1. "Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993). With regard to sidewalk liability, New Jersey courts adhered until fairly recently to the common law rule that an abutting owner of commercial or residential property was liable only for negligent construction or repair of a sidewalk, not for maintaining sidewalks against wear and tear, which was the responsibility of the government. In Stewart, the Court characterized the previous "no liability" rule as "anachronistic" and as "produc[ing] harsh and unfair results," 87 N.J. at 150, and it held that "commercial landowners are responsible for maintaining in reasonably good condition the sidewalks abutting their property and are liable to pedestrians injured as a result of their negligent failure to do so," id. at 149, 157. The Court concluded that imposing this duty on commercial property owners was fair because they retain substantial interests in abutting sidewalks, which provide "easy access to [and from] their premises and increase the value of their property," and they are in "an ideal position to inspect sidewalks and to take prompt action to cure defects." Id. at 151-52, 158. The Court expressly limited imposing the duty to maintain abutting sidewalks to commercial -- not residential -- properties. Id. at 159. (pp. 9-17)

2. The Appellate Division has frequently probed the gray area of whether mixed-use "residential" property has been converted into "commercial" for sidewalk liability purposes by analyzing the various uses of properties at issue. In Abraham, the Appellate Division found that the owner of a vacant lot zoned for commercial use did not owe a duty to a pedestrian injured on the abutting sidewalk, limiting Stewart's application to commercial properties with the "capacity to generate income." 281 N.J. Super. at 82-85. Gray v. Caldwell Wood Products, Inc. likewise focused on income potential and found that the owner of a then-vacant commercial building -- which the owner marketed for sale, insured, and permitted prospective buyers to inspect -- did owe a duty to a pedestrian injured on the sidewalk. 425 N.J. Super. 496, 498, 501 (App. Div. 2012). In Ellis v. Hilton United Methodist Church, the Appellate Division focused on whether a vacant church was a "commercial building" and held that, because it was not, the defendants had no duty to maintain the abutting sidewalk. 455 N.J. Super. 33, 40 (App. Div. 2018). (pp. 18-23)

3. As noted in Hopkins, whether a duty exists is ultimately a question of fairness. That guiding principle leads the Court to conclude that a duty should be imposed on all owners of vacant commercial lots to maintain the abutting sidewalks in reasonably good condition. Purchasing a vacant commercial lot is a business

2

decision that embraces the attendant costs and burdens of conducting business. The Court concludes that one of those costs necessarily includes maintaining the abutting sidewalks so that they are in a reasonably safe condition for innocent passersby. The Court rejects the suggestion to base liability on potential profitability as an unworkable approach that will only further confuse commercial sidewalk liability law, lead to inconsistent results, and unfairly harm the public. Abraham, Gray, and Ellis illustrate the difficulty of employing a case-by-case, commercial-property-by-commercial-property approach to determining when a duty is owed. In the Court's view, it matters not that there is no structure or active business being conducted on a commercial property. The Court notes that Stewart's sidewalk liability distinction should be between commercial and residential properties, not among certain types of commercial properties, or commercial properties with buildings, or commercial properties with active, potentially profitable entities on them. The bright-line rule articulated today -- that all commercial property owners owe a duty to maintain abutting sidewalks in reasonably good condition -- will ensure fairness, consistency, and predictability going forward. To the extent that Abraham conflicts with the Court's decision, it is overruled. The Court implores the Legislature to address the issue of commercial sidewalk liability. (pp. 24-32)

**REVERSED. REMANDED to the trial court.**

**JUSTICE SOLOMON, dissenting,** writes that the meaning of the well-reasoned and consistent decisions of Stewart, Abraham, and Gray is clear: commercial property owners with a capacity to generate income are liable for injuries caused by their failure to maintain their adjacent sidewalks. Noting that the Court and the Appellate Division have developed a common thread of factors to determine whether a commercial property has the capacity to generate income, Justice Solomon explains that, apart from the commercial zoning of defendants' property -- which under Abraham is insufficient to impose liability -- defendants' property has no characteristics of an income-generating property. Justice Solomon disagrees with the decision to overrule Abraham and expresses the view that the majority's decision infringes on legislative authority because the Legislature delegated to elected municipal officers the authority to impose sidewalk liability in N.J.S.A. 40:65-14. Justice Solomon notes that here, the elected leaders of Camden chose to act upon that authority by requiring in the City Code that sidewalks be maintained by and at the expense of property owners but chose to leave enforcement of that rule to the municipality itself rather than create a private cause of action. Justice Solomon would thus affirm the Appellate Division's judgment.

**CHIEF JUSTICE RABNER and JUSTICES FASCIALE and NORIEGA join in JUSTICE PIERRE-LOUIS's opinion. JUSTICE SOLOMON filed a dissent, in which JUSTICES PATTERSON and WAINER APTER join.**

3

SUPREME COURT OF NEW JERSEY
A-43 September Term 2022
087862

Alejandra Padilla,

Plaintiff-Appellant,

v.

Young Il An and
Myo Soon An,

Defendants-Respondents.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| November 8, 2023 | June 13, 2024 |

Michael Confusione argued the cause for appellant
(Hegge & Confusione, attorneys; Michael Confusione, on
the brief).

Samuel J. Myles argued the cause for respondents
(Holston, MacDonald, Uzdavinis & Myles, attorneys;
Samuel J. Myles, on the brief).

Alex R. Daniel argued the cause for amicus curiae The
New Jersey Civil Justice Institute (The New Jersey Civil
Justice Institute, attorneys; Anthony M. Anastasio, of
counsel, and Alex R. Daniel, of counsel and on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

For many years, this Court has considered the question of sidewalk liability with one goal in mind: fairness. Over the course of a century, this Court's jurisprudence regarding public sidewalk liability has evolved with the times and changing views of what is fair in this area of the law.

In this appeal, we are asked to determine whether owners of vacant commercial lots have a common law duty to maintain the public sidewalks abutting those lots in reasonably good condition.

In 2019, plaintiff Alejandra Padilla allegedly tripped, fell, and suffered serious injuries while walking on the public sidewalk abutting a vacant commercial lot in Camden owned by defendants Young Il An and Myo Soon An. Plaintiff sued defendants for negligence, claiming that their failure to reasonably maintain the sidewalk caused her fall and consequent injuries. Defendants moved for summary judgment, arguing that they did not owe her a duty of care. The trial court granted defendants' motion and the Appellate Division affirmed, holding that "the owner of a non-income producing vacant commercial lot has no duty to the public to maintain the lot's abutting sidewalk in a safe condition."

We now reverse. Considerations of fairness lead us to conclude that a duty should be imposed on owners of vacant commercial lots. Accordingly, we hold that all commercial landowners -- including owners of vacant

2

commercial lots -- have a duty to maintain the public sidewalks abutting their property in reasonably good condition and are liable to pedestrians injured as a result of their negligent failure to do so. Consistent with the rule we adopt today, we reverse the Appellate Division's judgment and remand the matter to the trial court for further proceedings.

I.

A.

The following facts are derived from the pretrial record.

On September 11, 2019, plaintiff allegedly tripped, fell, and suffered injuries on the sidewalk abutting a vacant commercial lot located at 2605-2609 Westfield Avenue in Camden. Plaintiff testified at her deposition that she suffered several injuries from the fall, including a broken foot and injured arm, and that she underwent surgery for her injuries. Plaintiff further testified that she continued to suffer symptoms, including migraines, pain, and memory loss.

At the time of plaintiff's fall, defendants owned the subject lot. Defendants purchased it 27 years before plaintiff's fall in March 1992. Defendant Young Il An was the only defendant to provide deposition testimony. Defendant testified that he bought the subject lot intending to construct a building there, but never did. Although the subject lot remained vacant during that time period, defendant testified that he visited and inspected

3

the subject lot with some frequency over the years, specifically "three or four times in a month."

In addition to purchasing the subject lot, defendants purchased an adjacent lot at 2611 Westfield Avenue; that lot was also vacant. According to defendant, he "thought that [he] would need [lots] 2605 to 2611 to put up a decent building," given the small size of the individual lots. When asked "is it true that you purchased 2611 Westfield in the hopes that in the future you could put a building and make some money on the property?," defendant responded, "I believe it's rather common sense that when anybody would make a purchase like that, it would be in the hopes of making money someday." When asked whether his hope was to build a property and either rent or sell it, defendant responded, "[i]f anybody does not think of it in that way, nobody should really purchase anything." When asked whether he purchased as many as six properties in Camden since 1990, defendant initially replied, "[i]t's been a very long time. I really can't remember," but then stated, "currently I have gotten rid of most of them."

According to defendant, they never built a structure on the subject lot or on the adjacent lot because "the economic situations [were] really bad, so I have given up doing that." Defendant further testified that he did not purchase liability insurance to cover the lot because insurance companies "didn't really

4

want to insure it." Defendant could not recall which insurance company did not want to insure the property. He also testified that, after plaintiff's fall, he had the sidewalk abutting the subject lot repaired.

B.

In April 2020, plaintiff filed a complaint alleging that defendants' negligence in failing to reasonably maintain the sidewalk abutting the subject lot caused her fall and resulting injuries. Defendants moved for summary judgment. After hearing oral arguments, the trial court granted defendants' motion, holding that defendants did not owe a duty of care to plaintiff. The court relied heavily on the Appellate Division's decision in Abraham v. Gupta, 281 N.J. Super. 81 (App. Div. 1995), which held that the liability imposed on commercial property owners to reasonably maintain abutting sidewalks does not apply to sidewalks abutting vacant lots. The court reasoned that defendants did not have a duty to maintain the sidewalk because it abutted a vacant lot that was not generating any income, citing this Court's decision in Stewart v. 104 Wallace Street, Inc., 87 N.J. 146 (1981). The trial court rejected plaintiff's contention that summary judgment was improper because a Camden municipal ordinance required defendants to maintain the lot's abutting

sidewalk,[1] explaining that municipal ordinances do not create a separate common law duty.

Plaintiff appealed, and the Appellate Division affirmed the trial court's decision in an unpublished opinion. The Appellate Division concluded that Abraham remained good law that applied to the subject lot and thus declined to impose on defendants the legal duty articulated in Stewart. The court held that "an owner of a non-income producing vacant lot owes no duty to the public to maintain the lot's abutting sidewalk in a safe condition." The Appellate Division, like the trial court, rejected plaintiff's reliance on the Camden municipal ordinance. The court found that plaintiff failed to show that defendants violated the ordinance and that, even if they had, a violation of an ordinance directing private persons to care for public property cannot provide the basis for a private cause of action.

Plaintiff filed a petition for certification presenting the issue of whether owners of vacant commercial lots owe a duty of care to pedestrians to reasonably maintain the sidewalks abutting those lots. We granted plaintiff's

---

[1] Part II, Chapter 735, Section 5 of the Code of the City of Camden provides in relevant part that "[t]he sidewalks in the streets of the City shall be kept in repair by the owner or owners of the abutting property at the cost and expense of the owner or owners of the lands in front of which any such sidewalk is constructed."

6

petition, 253 N.J. 570 (2023), and the New Jersey Civil Justice Institute's motion to appear as amicus curiae.

## II.

### A.

Plaintiff urges this Court to reverse the Appellate Division's judgment and remand the matter to the trial court to apply the Stewart standard. Plaintiff argues that the Appellate Division in Abraham impermissibly narrowed Stewart's holding and insists that nothing in that decision's language or rationale excuses a commercial property owner from a duty of care because their lot is vacant. Plaintiff contends that the Stewart Court distinguished commercial properties from residential properties but did not distinguish among types of commercial properties or consider whether those properties had active businesses on them. Plaintiff also asserts that imposing a duty of care is fair because the subject lot was capable of generating income, like the vacant commercial building in Gray v. Caldwell Wood Products, Inc., 425 N.J. Super. 496, 501 (App. Div. 2012), and could therefore absorb the costs of liability insurance.

### B.

Defendants urge us to affirm the Appellate Division's judgment, contending that they owed no duty of care to plaintiff or any member of the

7

public to maintain the sidewalk abutting the subject lot. Defendants claim that Abraham applies to this case rather than Stewart and Gray because there was neither a structure on the subject lot nor an active business enterprise being conducted on it. Defendants also argue that the policy considerations underlying this Court's opinion in Stewart -- profit-making potential and the capacity to spread the risk of loss -- do not apply to vacant commercial lots and thus do not justify imposing a duty of care on commercial property owners like themselves.

The New Jersey Civil Justice Institute (NJCJI), appearing as amicus curiae, supports defendants' arguments. NJCJI argues that imposing a duty on owners of vacant commercial lots would contravene the principles that Stewart articulated. NJCJI also contends that the mere potential to generate income does not warrant imposing liability on owners of vacant commercial lots. According to NJCJI, establishing a bright-line rule that owners of vacant commercial lots do not owe a duty to maintain abutting sidewalks promotes fairness, consistency, and predictability in our court system.

## III.

We review a grant of summary judgment de novo, applying the same standard that governed the trial court's determination. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). Under that standard, a court must grant summary judgment

8

"if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); Rivera v. Valley Hosp., Inc., 252 N.J. 1, 16 (2022).

We "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). When no issue of fact exists, and only a legal question remains, we owe no special deference to the trial court's legal determinations. DeSimone v. Springpoint Senior Living, Inc., 256 N.J. 172, 181 (2024).

## A.

The question before us concerns the development of our state's common law doctrine governing premises liability, a responsibility historically entrusted to this Court. See Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993) ("Determining the scope of tort liability has traditionally been the responsibility of the courts.").

In Hopkins, we stated that public policy and fairness considerations guide our determination in imposing a duty of care and formulating standards

9

to define that duty.  Ibid.  In carrying out that important function, this Court has "carefully refrained from treating questions of duty in a conclusory fashion, recognizing that '[w]hether a duty exists is ultimately a question of fairness.'"  Est. of Desir ex rel. Estiverne v. Vertus, 214 N.J. 303, 322 (2013) (alteration in original) (quoting Weinberg v. Dinger, 106 N.J. 469, 485 (1987)).  Indeed, we observed that "[w]hether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy."  Hopkins, 132 N.J. at 439.  We explained that the "inquiry involves identifying, weighing, and balancing several factors -- the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution."  Ibid.  We also stated that the analysis is "very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct."  Ibid.

To begin, we briefly turn to the history of our sidewalk liability jurisprudence to expound upon how the legal principles governing this area of law have developed over time in this state.

1.

A review of our case law stretching back more than a century indicates that until fairly recently, our courts adhered to the common law rule, under which an abutting owner of commercial or residential property was

> not liable for the condition of a sidewalk caused by the action of the elements or by wear and tear incident to public use, but only for the negligent construction or repair of the sidewalk by himself or by a specified predecessor in title or for direct use or obstruction of the sidewalk by the owner in such a manner as to render it unsafe for passersby.
>
> [Yanhko v. Fane, 70 N.J. 528, 532 (1976).]

That "no liability" rule was a product of early English common law, which provided that "the parish at large is prima facie bound to repair all highways lying within it." Stewart, 87 N.J. at 153-54 (quoting The King v. Inhabitants of Sheffield, 2 T.R. 106, 111 (K.B. 1787)); accord Weller v. McCormick, 47 N.J.L. 397, 399 (Sup. Ct. 1885) ("At common law the duty of keeping highways safe for travel pertained, ordinarily, to the parish at large."). That long-standing rule placed the primary responsibility of maintaining public sidewalks on the government. Stewart, 87 N.J. at 154; see Mount v. Recka, 35 N.J. Super. 374, 380 (App. Div. 1955) ("[T]he basic concept of the law has traditionally placed the primary responsibility for the construction and maintenance of streets and sidewalks on the government and has recognized a

11

distinction between the related duties of the municipal government and those of an abutting owner."); see also Fischer v. Salomone, 136 N.J.L. 431, 432 (Sup. Ct. 1948); Rupp v. Burgess, 70 N.J.L. 7, 9 (Sup. Ct. 1903).

Although the Court repeatedly declined to depart from the old "no liability" rule in subsequent cases, some members of the Court criticized the rule's harshness, unfairness, and incompatibility with modern times. To illustrate, Justice Jacobs found the old rule "pregnant with seeds of gross injustice for it tends to immunize the wrongdoer whose flagrant neglect of duty has caused injury to an innocent party who is left with recourse against no one." Moskowitz v. Herman, 16 N.J. 223, 228-29 (1954) (Jacobs, J., dissenting). Justice Proctor echoed that criticism fifteen years later in Murray v. Michalak, finding it "manifestly unjust to permit a property owner to sit idly by and watch with impunity as his sidewalk deteriorates to a point where it becomes a trap for unwary pedestrians and then to immunize him from liability when the all too foreseeable injuries occur." 58 N.J. 220, 223 (1971) (Proctor, J., dissenting). Justice Proctor further observed that the old rule discouraged property owners from repairing their sidewalks for fear of doing so negligently and risking liability. Ibid. Noting that the "law should always reflect the needs of a changing society," Justice Proctor said he would "place such a duty

12

on all abutting property owners," both of residential and commercial properties.  Id. at 225-26.

Despite the dissenting voices in prior cases, the Court again declined to depart from the "no liability" rule in Yanhko in 1976, reasoning that the public easement belonging to pedestrians leaves the abutting property owner with no control or dominion over the sidewalk, such that the owner cannot "properly . . . be described as 'maintaining'" the sidewalk.  70 N.J. at 533.  The majority of the Court concluded that it would be arbitrary to impose a duty on an abutting property owner "for no better reason than that his property is proximate to" the sidewalk.  Id. at 534.  The majority opined that it was the Legislature's role to "regulate such liability, not for the courts to impose it on the abutting owner as a convenient subject of liability."  Ibid. (footnote omitted).

In yet another compelling dissenting opinion, Justice Pashman asserted that "the landowner is not the powerless figure portrayed by the majority" given the various limitations placed upon the public easement to his economic benefit.  Id. at 542 (Pashman, J., dissenting).  He noted that commercial landowners "strongly encourage use of the sidewalk" to facilitate the success of their businesses, ibid., and warned that further adherence to the old rule would continue to produce undesirable and unfair results, id. at 546.  Like Justice Proctor in Murray, Justice Pashman explained that the old rule

13

disincentivizes a landowner from repairing a deteriorating sidewalk: because the landowner "may incur liability if he repairs a sidewalk in a negligent fashion, it is more advantageous for him to ignore the defective conditions altogether." Ibid. Justice Pashman cautioned that "[t]he practical operation of this rule produces a result which hardly comports with current standards of justice." Ibid.

2.

Five years later, in Stewart, the Court broke new ground and created an exception to the "no liability" rule that had been the law for decades specifically for commercial property owners. 87 N.J. at 149. In Stewart, the plaintiff left the defendant's tavern, walked a short distance, and fell on the sidewalk abutting an adjacent vacant lot, which the defendant also owned. Id. at 149-50. The plaintiff suffered injuries in the fall, which he alleged were caused by the sidewalk's seriously dilapidated condition. Id. at 150. In concluding that the defendant owed the plaintiff a duty, the Court overruled Yanhko and held that "commercial landowners are responsible for maintaining in reasonably good condition the sidewalks abutting their property and are liable to pedestrians injured as a result of their negligent failure to do so." Id. at 149, 157.

The Court characterized the previous "no liability" rule as "anachronistic" and as "produc[ing] harsh and unfair results." Id. at 150. Citing Justice Proctor's dissenting opinion in Murray, the Court reasoned that the old rule had become incompatible with modern-day uses of streets and sidewalks,[2] and it therefore modified the rule both to provide innocent injured parties with legal recourse and to incentivize abutting commercial property owners to keep their sidewalks in reasonably good condition. Id. at 155. The Court explained:

> This new rule responds to many of the weaknesses of the no liability rule. It will provide a remedy to many innocent plaintiffs for injuries caused by improper maintenance of sidewalks. As a corollary, it will give owners of abutting commercial property an incentive to keep their sidewalks in proper repair, a duty already created in many cases by municipal ordinances. It will also eliminate much of the arbitrariness of the old rule. In addition, injured persons will be able to recover for injuries sustained just outside a store as well as those sustained within it.
>
> [Id. at 157-58.]

---

[2] The Court noted that municipalities have not been solely responsible for sidewalk maintenance "for many years" because many imposed a duty on property owners through ordinances under N.J.S.A. 40:65-14, which authorizes municipalities to make it "the duty of any owner of abutting lands . . . to construct, repair, alter or relay any curb or sidewalk, or section thereof." Stewart, 87 N.J. at 155.

15

The Court concluded that imposing this duty on commercial property owners was fair because they retain substantial interests in abutting sidewalks, which provide "easy access to [and from] their premises and increase the value of their property." Id. at 151-52, 158. Moreover, the Court determined that owners of abutting property are in "an ideal position to inspect sidewalks and to take prompt action to cure defects." Id. at 158.

Mindful of the significant impact its decision would have on property owners, the Court expressly limited imposing the duty to maintain abutting sidewalks to commercial -- not residential -- properties. Id. at 159.[3] Notably, the Court found it "particularly compelling" to impose this duty on "abutting commercial property owners." Ibid.

Stewart instructed courts to determine which properties the new rule would cover by following "commonly accepted definitions of 'commercial' and 'residential' property . . . , with difficult cases to be decided as they arise." Id. at 160. Recognizing that the new rule would impose an expense on commercial property owners, the Court noted that it anticipated liability insurance would become available, the cost of which owners would absorb as a

---

[3] The Stewart Court "[did] not reach the question of whether the same duty should be imposed on owners of residential property or whether the policy considerations underlying the impositions of a duty on commercial property owners apply to residential property owners." 87 N.J. at 159 n.6.

16

necessary expense of doing business.  Ibid.  The Court strongly urged

legislative action, pointing out that "the law of sidewalk liability is an

appropriate subject for reconsideration by the Legislature."  Id. at 159 n.6.

The Legislature, however, did not act.

Two years after Stewart, this Court extended the newly adopted duty to

"include[] removal or reduction of the hazard of snow and ice dependent upon

the standard of care of a reasonably prudent person under the circumstances."

Mirza v. Filmore Corp., 92 N.J. 390, 400 (1983); see Pareja v. Princeton Int'l

Props., 246 N.J. 546, 558 (2021) (clarifying that Mirza's rule applies only after

the storm that created the dangerous condition has concluded); see also

Antenucci v. Mr. Nick's Mens Sportswear, 212 N.J. Super. 124, 128-30 (App.

Div. 1986) (extending the Stewart rule to a commercial tenant who is in

exclusive possession of the premises abutting the sidewalk); Vasquez v.

Mansol Realty Assocs., Inc., 280 N.J. Super. 234, 237-38 (App. Div. 1995)

(imposing liability on a commercial property owner whose commercial tenant

negligently failed to remove ice or snow as contractually obligated).

In 1988, we grappled with the difficult commercial-residential

distinction that Stewart foreshadowed in a case involving a plaintiff who

slipped on ice in front of a nonprofit private religious school.  Brown v. St.

Venantius Sch., 111 N.J. 325, 326 (1988).  As a threshold matter, the Court

17

recognized that the defendant parochial school was not a residential property because no one resided in the school and explained that the school's religious nature was not dispositive because the inquiry in the case of religious, charitable, or nonprofit owners focuses on the "use of the abutting land, not the nature of the organization that owns the property." Id. at 332-33.[4]  This Court ultimately decided that treating the school as "commercial" for sidewalk liability purposes was appropriate because requiring it to clear the abutting sidewalks was not an overly onerous burden, and it was fairer to allocate the risk of loss on the school rather than on an innocent pedestrian.  Id. at 334-35.  Thus, we held that the Stewart rule applied to the parochial school.  Id. at 338.

3.

Given the Stewart Court's instruction to trial courts to determine which properties the new rule would cover by following "commonly accepted definitions of 'commercial' and 'residential,'" 87 N.J. at 160, and its comment that apartment buildings should be considered commercial property and covered by the new rule, id. at 160 n.7, the Appellate Division has frequently

_____

[4]  Courts typically address the nature of the property's ownership to determine whether a property is commercial or residential.  Dupree v. City of Clifton, 351 N.J. Super. 237, 242 (App. Div. 2002), aff'd, 175 N.J. 449 (2003).  For instance, if the property is owned for "investment or business purposes," the property is often deemed commercial.  Mohamed v. Iglesia Evangelica Oasis De Salvacion, 424 N.J. Super. 489, 493 (App. Div. 2012).

18

probed the gray area of whether mixed-use "residential" property has been converted into "commercial" for sidewalk liability purposes by analyzing the various uses of properties at issue, see Grijalba v. Floro, 431 N.J. Super. 57, 62 (App. Div. 2013) ("[W]e have employed a case-by-case, fact-sensitive analysis to resolve the commercial-residential distinction.") (footnote omitted). Our assessment of those Appellate Division cases reveals that "central to the Appellate Division's inquiry in such matters has been whether a property's predominant use has the capacity to generate income, regardless of whether an actual profit is obtained through the use." Luchejko v. City of Hoboken, 207 N.J. 191, 206 (2011). Although we review those cases as part of the premises liability jurisprudence in our courts, we "need not address the universe of [those] appellate decisions, [given] their fine distinctions." Ibid.

Several Appellate Division cases, however, are particularly relevant to our discussion here because they reflect the lack of clarity in our courts' jurisprudence regarding commercial sidewalk liability law. As such, we briefly address them in turn.

Nearly 15 years after Stewart, the Appellate Division decided Abraham, on which defendants and amicus heavily rely. There, the plaintiff slipped and fell on snow that had accumulated on a sidewalk abutting the defendant's vacant lot, which was zoned for commercial use. 281 N.J. Super. at 82. The

19

lot was neither adjacent to nor used in conjunction with any enterprise or business the defendant owned or controlled. Ibid. The plaintiff claimed that the defendant was negligent in failing to properly maintain the sidewalk by not removing the ice and snow. Ibid.

In holding that the defendant did not owe a duty to the plaintiff, the Appellate Division distinguished Stewart which imposed a duty because the injury in that case occurred on a sidewalk abutting a vacant lot which was adjacent to and supported the defendant's bar, making it "an integral part of a commercial enterprise." Id. at 83. The court further explained that Stewart confined the duty to commercial enterprises or businesses, "but not upon the owners of vacant lots which are not utilized as part of such an enterprise or business." Ibid. In reaching that conclusion, the court gleaned from Stewart and its progeny an "unexpressed, but nevertheless intended limitation to its rule: liability is imposed upon the owner of a profit, or not-for-profit enterprise, regardless of whether the enterprise is in fact profitable." Id. at 85. The court limited Stewart's application to commercial properties with the "capacity to generate income," finding that qualification to be "the key." Ibid.

The Appellate Division identified two policy considerations in Stewart that justified imposing commercial liability: (1) commercial property owners derive benefits from public sidewalks providing safe and convenient access to

20

and from their businesses; and (2) commercial enterprises have "the capacity to spread the risk of loss arising from injuries on abutting sidewalks, either through the purchase of commercial liability policies or 'through higher charges for the commercial enterprise's goods and services.'" Ibid. (quoting Mirza, 92 N.J. at 397). Applying those principles, the court concluded that Stewart liability did not attach to the defendant's vacant commercial lot because it was "not owned by or used as part of a contiguous commercial enterprise or business"; it did not entertain daily business activity making safe and convenient access essential; and it lacked the capacity to generate income to purchase liability insurance or to spread the risk of loss onto customers. Ibid.

Defendant and amicus also rely on Gray, which reaffirmed but distinguished Abraham. 425 N.J. Super. at 501. In Gray, the defendant company owned a vacant commercial building with boarded windows, locked doors, and an iron gate. Id. at 498. The building was not connected to electricity but had been leased as a retail store five years prior. Ibid. The defendant marketed the property for sale, maintained a commercial insurance policy on the building, and permitted prospective buyers to enter and inspect the premises. Ibid. The plaintiff slipped and fell on the sidewalk in front of

21

the defendant's vacant commercial building, which had not been cleared of snow or ice.  Id. at 503.

In concluding that the defendant owed a duty to the plaintiff under Stewart, the court adopted Abraham's emphasis on income potential, finding that -- unlike the vacant lot in that case -- "[t]his building had the capacity to generate income."  Id. at 501.  Just as the Abraham court considered the property's status as a vacant lot, the Gray court highlighted that "[t]he property here is not a vacant lot but a commercial building."  Ibid.  The court explained that the building generated income in the recent past and could have been used to generate income again as a retail store; the defendant, however, chose to market it for sale.  Ibid.  Moreover, the court found that the defendant was liable under Stewart because it made the property accessible to potential buyers (thereby assuming a duty to keep it safe for its invitees), maintained liability insurance on the property, and sold it to make money.  Id. at 501-02.

4.

Subsequent cases continued to rely on, qualify, or distinguish Stewart, Abraham, and Gray, somewhat confounding our commercial sidewalk liability law.  To illustrate, in Nielsen v. Wal-Mart Store No. 2171, the Appellate Division stated in a footnote that what distinguished the properties in Abraham and Gray was their differing "potential to generate income," making no

mention of whether the properties contained structures or were vacant lots. 429 N.J. Super. 251, 258 n.4 (App. Div. 2013) ("We distinguished Abraham v. Gupta . . . , which held that no duty could be imposed on an owner of vacant property for the condition of abutting sidewalks, because in Gray the building had the potential to generate income.").

And recently, in Ellis v. Hilton United Methodist Church, the Appellate Division focused on whether the vacant church was a "commercial building," holding that "[h]ere, defendants' church is not a commercial building," so the defendants had no duty to maintain the abutting sidewalk. 455 N.J. Super. 33, 40 (App. Div. 2018). The court reasoned that the defendants were not liable for the plaintiff's fall in that case because the defendants never used the church for commercial purposes and it was not open to the public in any capacity once it stopped functioning as a church, despite defendants' maintaining liability insurance on the property. Ibid. The court declined to impose liability simply because the defendants' property "could have been put to use to generate income," reasoning that doing so would go beyond Stewart's intended reach and subject "any noncommercial or residential property . . . to sidewalk liability immediately upon it being vacated or abandoned because it had the potential to be converted to a commercial use." Ibid.

23

B.

In light of those legal principles and our courts' jurisprudence in this area, we now turn to the issue before this Court.

For over four decades since Stewart, our courts have adhered to the rule imposing liability on commercial landowners. We are now tasked with determining whether that same liability should apply to commercial landowners of vacant lots. As this Court noted in Hopkins, "'[w]hether a duty exists is ultimately a question of fairness.'" 132 N.J. at 439 (quoting Weinberg, 106 N.J. at 485). That guiding principle leads us to conclude that a duty should be imposed on owners of vacant commercial lots to maintain the abutting sidewalks in reasonably good condition. There is something profoundly unfair about commercial property owners purchasing vacant lots and having no responsibility whatsoever for maintaining the area where the general public traverses. We therefore hold that all commercial landowners -- including owners of vacant commercial lots -- must maintain the public sidewalks abutting their property in reasonably good condition and can be held liable to pedestrians injured as a result of their negligent failure to do so.

The moment an individual or an entity purchases a lot in a commercially zoned area, meaning the only use to which that land can be put is commercial, the purchaser has begun a commercial endeavor and intends to make money.

24

The Stewart Court instructed courts to determine which properties the then-new rule would cover by following "commonly accepted definitions of 'commercial' and 'residential.'" 87 N.J. at 160. "Commercial" is defined as "[o]f, relating to, or involving the ability of a product or business to make a profit," Black's Law Dictionary 336 (11th ed. 2019), and "for making a profit or relating to making a profit," Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/commercial (last visited April 23, 2024). As such, the predominant, if not sole purpose of a property in a commercially zoned area is to make a profit off that land.

By its essence, a commercial lot exists and is bought and sold for the purpose of making money. Defendant Young Il An admitted as much during his deposition. Defendant stated that he purchased the subject lot intending to build a commercial structure on it and make money. Defendant further opined that "[i]f anybody does not think of [buying commercial property] in that way, nobody should really purchase anything," in discussing one of the other vacant lots he maintained in Camden for decades. Indeed, when someone purchases a vacant commercial lot, that is a business decision that embraces all the attendant costs and burdens of conducting business. We conclude that one of those costs necessarily includes maintaining the abutting sidewalks so that they are in a reasonably safe condition for innocent passersby.

25

Defense counsel suggests that we adopt a case-by-case, fact-sensitive approach to determine when a commercial landowner owes a duty. Such an analysis could seemingly trigger a duty based on nebulous indicators ranging from when a brick-and-mortar business receives permits to begin construction, to when it opens its doors to the public, to when that business turns a profit. Counsel also suggested at oral argument that such a rule could focus on an "immediate path to profit" or "something so close to an active business that [is] about to open." Understandably, counsel could neither define those terms nor provide a practical framework for courts dealing with wide-ranging factual scenarios to determine how to apply them in the real world.

Trying to determine whether a business entity is profitable would be a difficult task indeed. It is common knowledge that many new businesses, in varying areas of commerce, take time to become profitable and often do not turn a profit for a year or more after officially opening for business, if the business survives at all. See, e.g., JPMorgan Chase & Co., Longevity, https://www.jpmorganchase.com/institute/research/small-business/small-business-dashboard/longevity (last visited April 22, 2024) ("Roughly a third of new businesses exit within their first two years, and half exit within their first five years.").

If profitability is the test, business entities that have not technically become profitable despite being open for business apparently would not owe a duty. And it seems our courts, in deciding whether a duty is owed, would be required to inspect the financial books of commercial entities to determine whether they are in the black or the red.

Given the broad implications of our tort liability decisions, we must adopt a sensible rule to appropriately resolve this specific case and govern future conduct. See Hopkins, 132 N.J. at 439. And profitability is challenging to calculate for new businesses even to determine contract-based claims, which require more business-related evidentiary showings than a sidewalk liability case. See Schwartz v. Menas, 251 N.J. 556, 576-77 (2022) (noting that lost profits for a new business are difficult to prove with reasonable certainty but declining to ban lost-profit damages for new businesses); Kenneth M. Kolaski & Mark Kuga, Measuring Commercial Damages Via Lost Profits or Loss of Business Value: Are These Measures Redundant or Distinguishable?, 18 J.L. & Com. 1, 8-9 (1998) ("Unestablished businesses are those businesses which are not yet profitable or have not yet established an operating track record from which to confidently and reliably project future operating performance. These young businesses may require the use of more assumptions and reliance on fewer pieces of documented data and information in preparing a damage

27

calculation than would be required for an 'established' or 'mature' business."). Accordingly, we find the suggestion to base liability on profitability or a path to profitability to be an unworkable approach that will only further confuse our commercial sidewalk liability law, lead to inconsistent results, and unfairly harm the public.

A bright-line rule that commercial property owners owe a duty, as first pronounced in Stewart, is the most workable rule to protect the general public and ensure consistency in our courts. In Abraham, Gray, and Ellis, the Appellate Division distinguished among different types of commercial properties in determining whether certain characteristics of commercial property should result in liability. Abraham, which involved a vacant lot, interpreted Stewart's holding to apply to commercial properties with the "capacity to generate income," which the appellate court held was not the case with the vacant lot in question. 281 N.J. Super. at 85. But in Gray, the Appellate Division concluded that the defendant commercial lot owner owed a duty to the plaintiff because the property had a capacity to generate income even though the building on the lot was vacant with boarded up windows and no electricity. 425 N.J. Super. at 498, 501. Some could argue that the vacant lot in Abraham had as much income-generating potential as the vacant

28

building because vacant lots can function to house a variety of commercial enterprises such as a parking lot, a farmers' market, or billboard advertising.[5]

These cases illustrate the difficulty of employing a case-by-case, commercial-property-by-commercial-property approach to determining when a duty is owed. "Fairness requires that one be able to ascertain what one's duty is and how it can be performed." Hopkins, 132 N.J. at 454 (Garibaldi, J., dissenting) (arguing that "the nebulous standards set by the majority . . . provide no guidelines" and the opinion "raises more questions than it answers" regarding the duty owed).

In our view, it matters not that there is no structure or active business being conducted on a commercial property. Certainly, Stewart's language four decades ago noted the profit-making aspect of owning commercial property and the capacity to absorb the costs of liability insurance or, alternatively, to raise prices on customers. 87 N.J. at 160; see Mirza, 92 N.J. at 397 ("Further, the goal of spreading the risk of loss would probably be served either through

---

[5] Furthermore, as amicus suggested, it is common practice for property owners to hold vacant lots for investment purposes -- presumably for their profit-making potential -- without intending to develop the lots themselves. Although defendants here ultimately decided not to build a structure on the subject lot, that does not mean the lot lacked profit-making potential. The record indicates that defendants have owned the subject lot for more than three decades. During that thirty-year period, under Gray's rationale, defendants could have used the lot to make money in various ways.

29

the increase of future insurance policy premiums, or, if the commercial property owner has no insurance, through higher charges for the commercial enterprise's goods or services."). Purchasing insurance and absorbing the cost of insurance was noted in <u>Stewart</u> as a means to spread the risk of loss. <u>See</u> 87 N.J. at 160. But again, an individual purchasing commercial land to make money has already decided to enter a business venture, so it is not unreasonable or unfair for such an individual to have to factor liability insurance into the cost of embarking on the journey of their commercial endeavor.

<u>Stewart</u>, however, assumed a brick-and-mortar business on the property was a necessary component of commercial enterprise, and with good reason. <u>See</u> 87 N.J. at 152 ("Public use of commercial establishments is facilitated by the existence of sidewalks."); <u>id.</u> at 158 ("In addition, injured persons will be able to recover for injuries sustained just outside a store as well as those sustained within it."). When the Court decided <u>Stewart</u> in 1981, the operation of a business or commercial enterprise necessarily involved the use and maintenance of brick-and-mortar physical premises, which is not always the case today. But <u>Stewart</u>'s basic principle -- "the right of the public to safe and unimpeded passage along the sidewalk" must continue to prevail. <u>See</u> <u>ibid.</u>

30

Stewart did not expressly distinguish between certain types of commercial properties or commercial properties with active businesses on them; rather, the Court distinguished only between commercial and residential properties. Id. at 160. We find it instructive that the Court referred throughout its opinion to "commercial landowners," id. at 157, "owners of abutting commercial property," ibid., and "abutting commercial property owners," id. at 150, 154, 159. The Court imposed the duty to maintain abutting sidewalks in reasonably good condition on "owners of commercial property." Id. at 159.

We therefore conclude that the sidewalk liability distinction should be between commercial and residential properties, not among certain types of commercial properties, or commercial properties with buildings, or commercial properties with active, potentially profitable entities on them. This is the distinction from Stewart. Moreover, the bright-line rule we articulate today -- that all commercial property owners owe a duty to maintain abutting sidewalks in reasonably good condition -- will ensure fairness, consistency, and predictability in our courts going forward. As noted in Stewart, the "standard of care, after all, will be reasonableness." Id. at 158. Thus, imposing this duty on owners of vacant commercial lots would not be "onerous," as defendants and amicus suggest. Nor would this ruling create "an

31

entirely new field of liability with respect to sidewalks, but . . . merely add[] to duties of abutting owners that already exist." Id. at 159.

Importantly, this rule will clarify the scope of commercial sidewalk liability and provide clear guidance to courts, commercial property owners, and the public. This rule furthers Stewart's "cardinal principle" to ensure the public's right "to safe and unimpeded passage along the sidewalk." Id. at 152; Mirza, 92 N.J. at 397.

In line with notions of public policy and judicial fairness, plaintiff will receive the benefit of the rule we announce today. See Fischer v. Canario, 143 N.J. 235, 246 (1996) ("[A]s a matter of public policy, to encourage litigants to challenge common law doctrines, courts often apply the new rule only to future cases and to the litigants whose efforts forged the development of the new legal rule."). To the extent that Abraham conflicts with our decision, it is hereby overruled.

Over forty years ago, this Court urged the Legislature to address the issue of commercial sidewalk liability. See Stewart, 87 N.J. at 159 n.6 ("We note . . . that the law of sidewalk liability is an appropriate subject for reconsideration by the Legislature."). We once again implore the Legislature to do so.

32

V.

For the foregoing reasons, we reverse the Appellate Division's judgment and remand this matter to the trial court for further proceedings consistent with the rule we adopt today.


CHIEF JUSTICE RABNER and JUSTICES FASCIALE and NORIEGA join in JUSTICE PIERRE-LOUIS's opinion. JUSTICE SOLOMON filed a dissent, in which JUSTICES PATTERSON and WAINER APTER join.

33

Alejandra Padilla,

Plaintiff-Appellant,

v.

Young Il An and
Myo Soon An,

Defendants-Respondents.

JUSTICE SOLOMON, dissenting.

Defendants purchased a vacant commercial property in 1992 and, for the last thirty years, have never used the property in any way that could generate income. Apart from its commercial zoning -- which, under Abraham v. Gupta, 281 N.J. Super. 81 (App. Div. 1995), is an insufficient basis to impose liability -- defendants' property has no characteristics of an income-generating property. The decisions in Stewart, Abraham, and Gray held that owners of commercial property with a capacity to generate income have a duty to maintain sidewalks abutting their property, and that failure to do so may give rise to liability in tort. Stewart v. 104 Wallace St., Inc., 87 N.J. 146, 157-60 (1981); Abraham, 281 N.J. Super. 83-86; Gray v. Caldwell Wood Prods., Inc., 425 N.J. Super. 496, 501-03 (App. Div. 2012).

1

The majority, purportedly relying on principles of fairness, now imposes liability on the owner of a non-revenue-generating lot, thereby placing the burden on a commercial property owner who has no means to address the resulting costs. That liability devalues defendants' property, resulting in further devaluation of surrounding properties. The majority's decision does not promote fairness; rather, the decision promotes unfairness to residents and businesses who have chosen to invest in Camden's future.

The majority's expansion of liability in this setting expropriates a decision that this Court in Stewart correctly stated rests with the Legislature elected by the citizens of New Jersey to set policy. I therefore dissent.

## I.

Historically, New Jersey followed the common law rule that the government bore "the primary responsibility for the maintenance of the sidewalks." Stewart, 87 N.J. at 154. In 1970, the Legislature enacted N.J.S.A. 40:65-14, which expressly states that "[a]ny municipality may prescribe by general ordinance in what case curbs and sidewalks shall be constructed, repaired, altered, relaid or maintained at the expense of the abutting landowners."[1]

---

[1] N.J.S.A. 40:65-14 could have, but does not, authorize a private right of action by injured pedestrians against abutting property owners. Instead, if a

2

A decade later, relying in part on N.J.S.A. 40:65-14, this Court held that "commercial landowners are responsible for maintaining in reasonably good condition the sidewalks abutting their property and are liable to pedestrians injured as a result of their negligent failure to do so." Id. at 157. We explained that the common law rule -- which imposed liability on governments, not individual property owners -- was "derived from conditions that no longer exist and [wa]s not responsive to" modern-day use of sidewalks, id. at 155, which instead supported imposing liability on the owners of businesses that benefited from the sidewalks, see id. at 159 ("[A]lthough the paved sidewalks fronting a commercial establishment are primarily for the use of the public generally, their condition is so beneficially related to the operation of the business that the unrestricted legal duty of maintaining them in good repair might, arguably, be placed on it." (quoting Krug v. Wanner, 28 N.J. 174, 180 (1958))). We specifically relied on the "obvious arbitrariness of the fact that in accidents occurring within the boundaries of business premises, a plaintiff injured as a consequence of [a] defendant's failure to maintain safe premises would have a cause of action, whereas" no cause of action would be

---

property owner fails to maintain sidewalks abutting property, the municipality may rectify the issue and charge the property owner for the cost of the repair. N.J.S.A. 40:65-14.

3

available to "the same plaintiff injured on a poorly maintained public sidewalk just outside the premises." Id. at 156-57.

We thus found that imposing the duty to maintain sidewalks on commercial property owners was reasonable because "sidewalks provide commercial owners with easy access to their premises and increase the value of their property," such that "[p]ublic use of commercial establishments is facilitated by the existence of sidewalks." Id. at 152; see also id. at 159 (stressing that "[t]he duty to maintain abutting sidewalks that we impose today is confined to owners of commercial property"). We believed that imposing the duty to maintain sidewalks on commercial property owners would "give owners of abutting commercial property an incentive to keep their sidewalks in proper repair, a duty already created in many cases by municipal ordinances," especially because commercial property owners are in "an ideal position to inspect sidewalks and to take prompt action to cure defects." Id. at 157-58.

However, we explicitly stated that "the law of sidewalk liability is an appropriate subject for reconsideration by the Legislature." Id. at 159 n.6 (emphasis added).

In Abraham, the Appellate Division further explained Stewart's rule: commercial property owners with the "capacity to generate income" have a duty to maintain the sidewalks that abut their property. 281 N.J. Super. at 85.

4

In that case, the plaintiff slipped and fell on a sidewalk abutting the defendants' vacant lot.  Id. at 82.  Although the lot was zoned for commercial use, the Abraham court highlighted that the lot was "not adjacent to or used in conjunction with any enterprise or business owned or controlled by [the] defendant."  Ibid.  In declining to impose liability on the defendant, the court explained that Stewart imposed liability for damages because the plaintiff fell on a sidewalk that abutted a vacant lot adjacent to the commercial property, which "suggest[s] that liability was imposed because the abutting sidewalk where the fall occurred was an integral part of a commercial enterprise."  Id. at 83 (citing Stewart, 87 N.J. at 150).  The Abraham court reasoned that Stewart's analysis "underscores an important policy underpinning to its holding:  the benefits enjoyed by the 'commercial establishment' by use of abutting sidewalks for ingress and egress purposes should impose a concomitant duty to keep those means of ingress and egress in reasonably good repair."  Id. at 84.  As the Abraham court explained, Stewart's analysis implied that a duty of care is confined to commercial enterprises or businesses, "but not upon the owners of vacant lots which are not utilized as part of such an enterprise or business."  Id. at 83.

According to Abraham, "our courts have focused on a second policy consideration" stemming from Stewart and its progeny:  "the commercial

enterprise's capacity to spread the risk of loss." Ibid. The Abraham court concluded that the presence of "an unexpressed, but nevertheless intended limitation to its rule . . . the capacity to generate income . . . is the key." Id. at 85 (emphases added). The court explained further that "liability is imposed because of the benefits the entrepreneur derives from providing a safe and convenient access for its patrons" and because commercial establishments "ha[ve] the capacity to spread the risk of loss arising from injuries on abutting sidewalks, either through the purchase of commercial liability policies or 'through higher charges for the commercial enterprise's goods and services.'" Ibid. (quoting Mirza v. Filmore Corp., 92 N.J. 390, 397 (1983)).

Applying that rule, the Abraham court found that policy considerations derived from Stewart were inapplicable because the lot in question was "not owned by or used as part of a contiguous commercial enterprise or business," nor was there daily business activity on the lot that would require access by patrons. Ibid. Importantly, the Abraham court determined that "[t]he lot has no means of generating income to purchase liability insurance or to spread the risk of loss by the increase in cost of goods sold or services rendered." Ibid. Additionally, the Abraham court expressly concluded that "[s]imply because it is designated 'commercial' by the City's zoning ordinance is an insufficient

6

basis to impose the Stewart liability rule upon its owner." Id. at 85-86 (emphasis added).

Seventeen years later, the principles of Stewart and Abraham were applied in Gray, in which the plaintiff was injured "when she slipped and fell on an ice and snow covered sidewalk in front of [the] defendant's commercial building." 425 N.J. Super. at 498. At the time, "the building was vacant and had been since the prior tenant vacated" over one year earlier. Ibid. "The building had no electricity and was secured with boarded windows, locked doors and an iron gate." Ibid. The parties did not dispute that the property was commercial, given that "during defendant's ownership, the property had been leased as a retail store, was being marketed for sale as a commercial property, and prospective buyers were permitted entry to inspect the premises." Ibid. In addition, the defendant "maintained a commercial insurance policy on the building." Ibid.

The defendant "argued that there was no legal basis for sidewalk liability because the property was vacant and no business operations or activities were being conducted at the property at the time of the accident." Id. at 498-99. The plaintiffs countered by arguing "facts to support the imposition of sidewalk liability," including "the property's potential to generate income; the active marketing of the property at the time of the accident; the eventual sale

7

of the property two months after the accident; and the owner's ability to spread the risk, as evidenced by the commercial insurance coverage on the property." The trial court, likening the commercial property in Gray to the one in Abraham, granted summary judgment. Ibid. The Appellate Division reversed. Id. at 503.

Distinguishing Abraham, the Gray court reasoned that the property at issue was "not a vacant lot but a commercial building" that "had the capacity to generate income and, had, in fact, generated income in the recent past." Id. at 501. The court explained that the commercial property could have been used as a retail store but that "the owners chose to market the property for sale." Ibid. In doing so, the defendant "made the property accessible to potential buyers[,] thereby subjecting itself to the duty to keep their property safe for their invitees." Ibid. In addition, the court considered that the "[d]efendant maintained property insurance, presumably to protect against injuries to their invitees." Id. at 501. Defendant then "sold the property to make money." Id. at 502. The court concluded that the "[d]efendant [was] precisely the type of commercial property owner upon whom it is appropriate to impose liability." Ibid.

Since 1981, the rule in Stewart has been developed, first by Abraham in 1995, and then by Gray in 2012. The meaning of the well-reasoned and

8

consistent decisions of Stewart, Abraham, and Gray is clear:  commercial property owners with a capacity to generate income are liable for injuries caused by their failure to maintain their adjacent sidewalks.  E.g., Stewart, 87 N.J. at 157-60; Abraham, 281 N.J. Super. 83-86; Gray, 425 N.J. Super. at 501-03.

## II.

Although we have not explicitly defined the meaning of "generates income" in this context, this Court and the Appellate Division have developed a common thread of factors used to make this determination:  whether the commercial property presently generates income, whether the commercial property recently generated income for the same owner (including whether it has the potential to continue to be used in this same manner), whether the commercial property will soon generate income, and whether the commercial property owner has invited business invitees.  See, e.g., Gray, 425 N.J. Super. at 499, 501-02; Abraham, 281 N.J. Super. at 85.[2]

Defendants' vacant commercial property was purchased in 1992, and, for the last thirty years, has never been used by defendants in any way to generate

---

[2]  Applying these factors does not, despite the majority's assertion, require a court to "try[] to determine whether a business entity is profitable"; we agree with the majority that any such inquiry would be "unworkable."  See ante at ___ (slip op. at 25-27).

9

income.  Defendants' vacant commercial property has not and cannot reasonably be expected to generate income given that defendants are unable to sell the lot, have not invited invitees to enter the lot, have no insurance for the lot, and have no plan to develop the lot.

Apart from the commercial zoning of defendants' property, which under Abraham is insufficient to impose liability, defendants' property has no characteristics of an income-generating property.  Applying the factors courts have used for decades to determine whether a commercial property has the capacity to generate income, defendants' property clearly has no such capacity and no means to defray the costs of possible liability.

I disagree with the majority's decision to overrule Abraham.  The issuance of the majority's blanket rule -- that sidewalk liability should be based exclusively on the nature of the property's zoning -- eliminates the long-accepted distinction that Abraham imposed among commercial property owners.  The majority presumes that relying on zoning ordinances to determine the distinction between commercial and residential properties will promote fairness and add to the rule that already exists, but overruling Abraham eviscerates that presumption.  By overruling Abraham, the majority ignores precedent and appropriates the role of the Legislature.

10

Under the guise of fairness, the majority expands the law to impose upon all owners of commercially zoned property the duty to maintain sidewalks adjacent to their properties and provide liability[3] for damages to those injured when they fail to discharge that duty. But the Legislature delegated to elected municipal officers, not this Court, the authority to impose on property owners the duty to maintain sidewalks within the municipality or to provide a private cause of action to recover damages against a property owner for the failure to do so. N.J.S.A. 40:65-14. That is because municipal officers are better poised to balance the benefits of imposing liability on property owners against the costs associated with liability, which may deter investment in real estate in a way that conflicts with other legislation designed to encourage and promote development. Even in Stewart, we called upon the Legislature to resolve any further issues regarding sidewalk liability, noting "that the law of sidewalk liability is an appropriate subject for reconsideration by the Legislature." Stewart, 87 N.J. at 159 n.6 (emphasis added). The majority, however, disregards N.J.S.A. 40:65-14 and prior precedent, and instead chooses to improperly infringe on legislative authority.

---

[3] As we recently and unanimously acknowledged in Goyco v. Progressive Insurance Company, it is the domain of the Legislature to weigh costs and benefits in the field of insurance. See 257 N.J. 313, 329 (2024).

11

Here, Camden chose to act upon the authority delegated to it by the State Legislature pursuant to N.J.S.A. 40:65-14 by requiring that sidewalks "be kept in repair by the owner or owners of the abutting property at the cost and expense of the owner or owners of the lands in front of which any sidewalk is constructed." City of Camden Code § 735-5. However, if the property owner does not discharge that duty, Camden has chosen not to create a private right of action for injured pedestrians. Instead, the democratically accountable leaders of the City chose to require that "[i]f any owners or persons shall fail to construct or repair such sidewalks," then the government can repair the sidewalk and charge "the cost thereof, with interest" to the property owner. City of Camden Code § 735-8.

The majority undertakes an expansion of liability that should be decided by the Legislature. Ultimately, the common law exists only by the grace of the Legislature and can be changed by the Legislature at any time. See, e.g., State v. Smith, 85 N.J. 193, 199 (1981) (explaining that the common law is "subject to change by the Legislature"); Mayor & Council of Alpine v. Brewster, 7 N.J. 42, 50 (1951) ("There can be no doubt of the power of the lawgiver to classify and define public nuisances, and thus to modify the common-law classification. Apropos of this, Justice Holmes said: 'It is settled that, within the constitutional limits not exactly determined, the Legislature may change

12

the common law as to nuisances, and may move the line either way, so as to

make things nuisances which were not so, or to make things lawful which were

nuisances, although by so doing it affects the use or value of property.'"

(quoting Commonwealth v. Parks, 30 N.E. 174, 174 (1892))); LaFage v. Jani,

166 N.J. 412, 460 (2001) (LaVecchia, J., concurring in part) ("The Legislature

is free to expand, modify, or abrogate common law as it may reasonably

determine."); United States v. A & P Trucking Co., 358 U.S. 121, 124 (1958)

("[T]he power of Congress to change the common-law rule is not to be

doubted.").

Even the majority "implore[s] the Legislature" to act. Ante at ___ (slip

op. at 33). We agree that the Legislature should consider the weighty

questions raised by this case. Because the citizens of New Jersey elect

legislators to set policy, the Legislature can weigh competing interests and

determine which property owners have a duty of care. Similarly, elected

bodies have the institutional capacity to hold hearings and conduct data-driven

analyses; they can thus enact statutes that make the kinds of fine distinctions

required for a consistent, cohesive, and comprehensive approach to liability.[4]

---

[4] See, e.g., N.Y.C. Admin. Code § 7-210 (b) ("Notwithstanding any other
provision of law, the owner of real property abutting any sidewalk, . . . shall be
liable for any injury to property or personal injury, including death,
proximately caused by the failure of such owner to maintain such sidewalk in a

Courts, on the other hand, reach case-specific determinations based on the limited number of factual settings that they encounter in appeals and judicial decisions, which even cumulatively, do not necessarily provide a clear-cut set of rules to guide property owners, courts, and parties.[5]  It is the Legislature that can make the systemic policy determinations necessary for such guidance.

<hr />

reasonably safe condition.  Failure to maintain such sidewalk in a reasonably safe condition shall include, but not be limited to, . . . the negligent failure to remove snow, ice, dirt or other material from the sidewalk.  This subdivision shall not apply to one-, two- or three-family residential real property that is (i) in whole or in part, owner occupied, and (ii) used exclusively for residential purposes.").

[5]  See, e.g., Brown v. Saint Venantius Sch., 111 N.J. 325, 326 (1988) (non-profit religious school was commercial and therefore could be held liable under Stewart); Restivo v. Church of Saint Joseph of the Palisades, 306 N.J. Super. 456, 458 (App. Div. 1997) (church that leased part of a church-owned building to a nonprofit community organization, at less than market value, to run a Head Start program and leased the remainder of the building to tenants who paid below-market rent or no rent was commercial and therefore could be held liable under Stewart); Dupree v. City of Clifton, 351 N.J. Super. 237, 239-40 (App. Div. 2002) (nonprofit church that used its property only as a church was not commercial and had no duty under Stewart, even though the church itself had actually constructed the sidewalk); Hambright v. Yglesias, 200 N.J. Super. 392, 395 (App. Div. 1985) (two-family house in which both units were occupied by tenants was commercial because it is "the nature of the ownership that matter[s], not the use to which the property is put"); Borges v. Hamed, 247 N.J. Super. 295, 296 (App Div. 1991) (three-family home in which the owner lived in one unit and the other two units were rented was not commercial and the owner owed no duty under Stewart); Luchejko v. City of Hoboken, 207 N.J. 191, 205 (2011) (104-unit condominium complex was not commercial because, when dealing with nonprofit owners, "the examination must focus on the nature of the use of the property and not the nature of the ownership" (internal quotation omitted)).

14

III.

In sum, Stewart, Abraham, and Gray held that owners of commercial property with a capacity to generate income are liable in tort for injuries sustained on adjacent sidewalks.  See Stewart, 87 N.J. at 157-60; Abraham, 281 N.J. Super. 83-86; Gray, 425 N.J. Super. at 501-03.  The decision to expand this legal principle should rest solely with the Legislature, elected by the citizens of New Jersey to set policy.  I would thus affirm the Appellate Division's judgment, and I respectfully dissent.